UNITED STATES of America,
Plaintiff–Appellee,

v.

Annette JOHNSON,
Defendant–Appellant.

No. 88–2685.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1990.
Decided Aug. 23, 1990.

Patrick J. Foley, Asst. U.S. Atty., Patrick J. King, Jr., Alexander S. Vesselinovitch, Chicago, Ill., for plaintiff-appellee.

Suzanne Philbrick, Oak Lawn, Ill., Robert A. Willis, Chicago, Ill., for defendant-appellant.

Before COFFEY, MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

The Chicago Police temporarily detained Annette Johnson as a suspected drug courier at Chicago's Union Station. Although she was not arrested, the police did detain and search her luggage. Johnson appeals the district court's denial of her motion to suppress the evidence, consisting of cocaine found in her luggage. We affirm.

## I. FACTS

Johnson arrived at Union Station in Chicago on July 22, 1987 aboard an Amtrak train she boarded in Los Angeles. The train was nearly three hours late according to the published schedule. Johnson expected her fiance Arnell Corbin to meet her at the station. While she looked about for

him, she also noticed people looking at her. When she did not see her fiance, she telephoned and asked him to pick her up. Afterward, as she walked toward the main terminal, two men who identified themselves as police officers stopped her.

The officers were Richard Boyle of the Chicago Police Department, assigned to the Drug Enforcement Administration Task Force at Union Station, and Amtrak Policeman Robert Suave. Boyle was a 22–year veteran of the Chicago Police Department, spending the last seven years in drug interdiction at Chicago's Amtrak stations and airport terminals. Earlier in the day, Boyle and Suave met with other police officers to review information about potential drug couriers on incoming trains. Armed with a computer printout of information about passengers on the train from Los Angeles, Boyle noticed that Annette Johnson fit the profile of a typical drug courier. Boyle knew Los Angeles was a source city for drugs. Boyle learned from the print-out and from conversations with Suave that Johnson had purchased a one-way ticket on the train's sleeper car for $453 in cash. He knew the purchase was made just one day before the train left Los Angeles, and that Johnson picked up the ticket minutes before departure. He knew the telephone call-back number given by whoever ordered Johnson's ticket was answered by people who said they had never heard of Johnson. The officers boarded the train prior to arrival and watched Johnson enter the station. They watched her make a purchase at a candy store, then a five-minute telephone call. As she walked through the station she continually looked around and back over her shoulder. Having seen enough, Boyle displayed his badge and asked to speak with her.

Johnson agreed to speak with Boyle. He asked her for identification and her train ticket. She began to tremble and shake as she handed the ticket to Suave. Her ticket was in the name G. Johnson, and she produced a blood identification card in the name of Annette Corbin. She explained the discrepancy by telling the officers she was engaged to a man named Corbin. Boyle asked for photo identification. While she went through her purse, Boyle observed some sort of photo identification, perhaps a driver's license. Boyle testified that Johnson told him she had no photo identification. Johnson testified that she produced California photo identification in the name Annette Johnson.

In response to her question Boyle said he was conducting a narcotics investigation. After Johnson admitted owning the bags, Boyle asked if he could search them. He explained that she could refuse to allow the search. She refused to consent, then stated that she wanted to speak to her attorney.

Johnson walked 10 to 15 feet away to a public telephone and called her attorney, Dominic Dolci. Johnson testified that as she went to the phone Boyle and Suave grabbed her purse, suitcase and handbag. The agents testified that they did not touch her baggage until after she placed the phone call, and only when she decided to leave the station. While on the phone, Johnson called Boyle over to speak to Dolci. Dolci asked if Johnson was under arrest. Boyle said she was not. Dolci told Boyle he had advised Johnson to not consent to a search and to leave the train station. Boyle gave the phone back to Johnson and she resumed speaking to Dolci. While at the telephone, she claims to have noticed several other police officers gathered around. Boyle testified that other officers were in the station, but not in proximity to Johnson.

Boyle told Johnson he intended to detain her bags temporarily so a narcotics dog could sniff them. He told her she could wait until the sniff was completed in a few minutes and then take her bags if the dog did not detect any drugs. She declined the offer and left the station. Five minutes after she left, the narcotics dog indicated drugs were contained in Johnson's suitcase. Boyle obtained a search warrant for the luggage, and recovered a kilogram-sized package of cocaine from an attache case inside Johnson's suitcase.

Johnson was indicted February 18, 1988, for possession with intent to distribute co-

caine in violation of 21 U.S.C. § 841(a)(1) and travel in interstate commerce to promote an illegal activity in violation of 18 U.S.C. § 1952(a)(1) and (a)(3).

## II. PROCEEDINGS

After hearing testimony from Boyle and Johnson and reviewing the memoranda submitted by both sides, the district court denied Johnson's motion to suppress the evidence. The court ruled that "there was no Fourth Amendment seizure under the circumstances presented in the evidence...." The court found that, under the totality of the circumstances, Johnson was not seized within the meaning of the Fourth Amendment. The court found that a reasonable person in Johnson's position would have "felt free to leave." The court pointed out that Johnson obviously "felt free to leave because she in fact did leave.... [S]he certainly felt that she was able to leave because she in fact was able to do so." The court also found that, even if the Fourth Amendment were implicated, the stop was reasonable because the officers had "specific and articulable" reasons for temporarily detaining Johnson.

Johnson entered a conditional guilty plea pursuant to Fed.R.Crim.P. 11(a)(2), reserving the right to appeal the district court's denial of her motion to suppress.

## III. ANALYSIS

We will not overturn the district court's denial of a motion to suppress unless the decision was clearly erroneous. *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990); *United States v. Ingrao*, 897 F.2d 860, 862 (7th Cir.1990). "Our inquiry is factually based and requires that we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." (Citations omitted). *Edwards*, 898 F.2d at 1276.

The Supreme Court has developed three categories for police-citizen encounters in relation to the Fourth Amendment. We thoroughly set forth those categories in *United States v. Black*, 675 F.2d 129, 133

(7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment. *United States v. Mendenhall*, 446 U.S. 544, 553–55, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980); *Terry*, 392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16.

The district court here determined that the encounter between the officers and Johnson fell into the third category, and we agree. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16. The police "do not violate the fourth amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Notorianni*, 729 F.2d 520, 522 (7th Cir. 1984). "In this sort of police/citizen encounter, 'the degree of suspicion that is

required is zero.' *United States v. Serna–Barreto*, 842 F.2d 965, 966 (7th Cir.1988)." *Edwards*, 898 F.2d at 1276.

In *United States v. Teslim*, 869 F.2d 316, 321 (7th Cir.1989), we noted that "[t]his circuit has adopted the Supreme Court's 'reasonable person' test for determining whether a seizure has occurred in airport [and presumably train station] cases...." (Citing *Black*, 675 F.2d at 134.) "In *Mendenhall*, the Supreme Court concluded that 'a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' *Mendenhall*, 446 U.S. at 554 [100 S.Ct. at 1877].... " *Teslim*, 869 F.2d at 321.

The facts in *Edwards* bear a striking resemblance to our own. Edwards was stopped at Union Station in Chicago after arriving on an Amtrak train from the source city of Los Angeles. *Edwards*, 898 F.2d at 1277. He looked around nervously and appeared shaken when stopped by officers. *Id.* His ticket was paid for in cash. *Id.* The officers asked if they could speak with Edwards, and he consented. *Id.* at 1275. They asked to search his bags but told him he could refuse to consent. *Id.* He refused. *Id.* The officers told him he was not under arrest and that he could leave at any time. *Id.* The officers detained his luggage for a drug sniff by a narcotics dog. *Id.* at 1274. Edwards left before the drug sniff. *Id.* at 1275. The sniff was positive, and after obtaining a search warrant, the officers recovered cocaine and marijuana from his suitcase. *Id.* at 1274.

■ We held in *Edwards* that this encounter with the police did not implicate the Fourth Amendment. There is no material distinction between Edwards' encounter and the officers' encounter with Johnson. Johnson also voluntarily answered questions and cooperated with the police. She was told she was not under arrest. She was told she could leave at any time, and she did leave after speaking with her attorney by telephone. When a citizen's liberty is not restrained by the police, no Fourth Amendment rights are implicated. *Terry*, 392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16.

Johnson argues this was a "seizure" within the meaning of the Fourth Amendment because the police made a "predetermination" to stop her based on her resemblance to the drug courier profile. The facts of the case indicate otherwise. The police told her she was not under arrest and was free to go. At no time did they use force against her or prevent her from leaving. Of course the officers planned to speak with her because of the drug courier profile; nevertheless, their actions did not restrain her liberty in any way. Moreover, their reliance on a drug courier profile to single out Johnson was not improper. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1586–87, 104 L.Ed.2d 1 (1989).

Johnson also contends she was intimidated into staying and answering questions by the presence of seven police officers, and that she did not believe she could leave. But Johnson said nothing incriminating to the officers while she answered questions. She was not too intimidated to call her attorney, or to refuse to allow the police to search her luggage. Her entire encounter with the police lasted fewer than 10 minutes. The police told her she was free to go. And ultimately, this argument fails because the uncontroverted evidence is that Johnson did leave the station without hindrance from any of the supposedly intimidating officers.

■ Because no Fourth Amendment rights were implicated, we need not discuss whether the police had specific and articulable facts giving rise to a reasonable suspicion that Johnson had committed or was committing a crime. Nor does Johnson raise the issue of whether her Fourth Amendment rights were violated by the temporary detention of her bags. That detention did require specific and articulable facts, but Johnson does not challenge it so the issue is not before us. Nevertheless, we would point out that *Edwards* decides that question against Johnson as well. Edwards did challenge the tempo-

rary detention of his bags, and we found that under the totality of the circumstances, the police had the requisite "reasonable suspicion." In our case, the police had significantly more reason to suspect Johnson than the police had to suspect Edwards. Like Edwards, Johnson was travelling from the source city of Los Angeles and had purchased a cash ticket. Like Edwards she appeared nervous and was constantly looking around. Like Edwards she was nervous and trembling when approached by police for questioning. But the police also knew that the call-back number given by the person who purchased the ticket for Johnson in Los Angeles was wrong; they knew the ticket was picked up just 20 minutes before departure; they knew she was travelling under an assumed name; they knew she lied about possessing photo identification. This means that not only was the temporary detention of her luggage proper, but that even if she was "seized" within the meaning of the Fourth Amendment, the police had sufficient "reasonable suspicion" to justify the seizure. *See also United States v. Skidmore,* 894 F.2d 925, 928 (7th Cir.1990); *United States v. Sullivan,* 903 F.2d 1093 (7th Cir.1990).

## IV. CONCLUSION

Because Johnson was not "seized" within the meaning of the Fourth Amendment, the district court properly denied her motion to suppress the evidence. The judgment of the district court is

AFFIRMED.