UNITED STATES of America,
Plaintiff–Appellee,

v.

Brandon ODUM, also known as Brent Ow-
ens, also known as Brandon Owens, also
known as Brian Douglas, also known as
Bryant Odum, Defendant–Appellant.

No. 95–1460.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1995.

Decided Dec. 22, 1995.

Rehearing Denied Jan. 11, 1996.

Alan N. Grossman (argued), Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Sam Adam (argued), Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and MANION and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

After the district court denied his motion to suppress, Brandon Odum entered a conditional plea of guilty to the charge that he had possessed with the intent to distribute approximately 5.8 kilograms of a substance containing cocaine in violation of 21 U.S.C. § 841(a)(1). He now appeals that conviction, arguing that the district court erred in refusing to suppress the cocaine found by law enforcement agents in a suitcase Odum had transported from Houston to Chicago. Because the district court considered improper facts in determining that the agents had reasonable suspicion to support their detention of the suitcase, we remand to enable the district court to reconsider that question without reference to the improper facts.

## I.

The facts relevant to the suppression issue are derived from Odum's affidavit, which was incorporated into his motion, from the complaint for search warrant prepared by DEA Narcotics Task Force Agent Martin Gainer, and from the testimony of Agent John Malloy, also of the Narcotics Task Force, at Odum's December 7, 1993 detention hearing.

On November 30, 1993, immediately before the departure of a Southwest Airlines flight from Houston to Chicago, Odum paid cash for a pre-reserved one-way ticket. Odum asked the ticket agent for cellophane tape to secure the locks on a yellow, hard-sided suitcase, which he then checked with the airline for the trip to Chicago. Because Odum had purchased his ticket and checked the suitcase so close to the flight's departure time, the suitcase was affixed with a late check-in tag. As Odum proceeded to his flight, the Southwest ticket agent reported her encounter with Odum to Officer Griff Maxwell, a Houston police officer assigned to the airport. Maxwell then called Agent Gainer in Chicago, relaying what he had learned from the ticket agent. Maxwell told Gainer that an African–American male of medium height had approached the Southwest ticket counter immediately before the departure of a Chicago flight and purchased a one-way ticket with cash. Maxwell explained that the man had asked the ticket agent for cellophane tape to secure the locks on a yellow, hard-sided suitcase, and that he had then checked the suitcase with the agent. Maxwell told Gainer that the man was carrying a black shoulder bag, that he was traveling under the name Brent Owens, and that his reservation for the flight had been made the previous evening.

Gainer then went with other agents to Chicago's Midway Airport to meet the Southwest flight, which was scheduled to arrive at 10:30 a.m. The agents positioned themselves directly across from the arrival gate and observed the passengers deplane. An African–American male with a black shoulder bag eventually emerged from the gate and proceeded down the concourse. Agent Gainer followed the man and observed him turn his head twice to look back over his shoulder, scanning the area behind him. As he made a right turn toward the baggage claim area, the man again looked back over his shoulder. The man entered the baggage claim area and waited for the arrival of the luggage from the Southwest flight. When he saw the yellow suitcase on the baggage carousel, the man approached it, looked around, and then lifted it from the carousel. Agent Gainer saw that the suitcase was large and that it had tape over the locks. At this point, the man made direct eye contact with Gainer and maintained it for a moment before looking away. The man then left the baggage claim area after showing his claim check to a security guard.

Agents Gainer and Malloy approached Odum, identified themselves as police officers, and asked to speak with him. Although both agents were dressed in civilian clothes, they displayed identification to confirm that they were police officers. Odum agreed to speak with the agents because, according to his affidavit, he initially wanted to cooperate by answering their questions. Gainer first inquired whether Odum had come into Chicago on the Southwest flight from Houston, and Odum stated that he had. Gainer then told Odum that he was not being accused of any crime and that he was not under arrest but that if Odum did not mind, Gainer wanted to ask him a few more questions. Odum told Gainer to "go ahead."

Gainer then asked to see Odum's airline ticket. Odum showed the agent a ticket that had been purchased with cash earlier that day. The ticket bore the name "Brent Owens." Gainer asked if Odum had any personal identification, and Odum responded that he did not.[1] In response to a series of questions, Gainer then learned that the yellow suitcase belonged to Odum, that Odum had packed part of the suitcase himself, that his sister had packed the other part, that

---

1. Agent Malloy testified at the detention hearing that he and Gainer had asked at this point whether "Brent Owens" was the subject's real name. Malloy testified that Odum admitted this was not his name and told the agents that his real name was Brandon Owens. (Dec. 7, 1993 Tr. at 9, 14.) Gainer's complaint for a search warrant did not mention such an exchange, however, and the district court did not rely on Malloy's testimony on this point.

Odum alone had packed the black shoulder bag, and that no third party had given Odum any packages to bring to Chicago.

At this point, Odum asked the reason for Gainer's questions, and the agent told Odum that he and Malloy were conducting a narcotics investigation at the airport in order to intercept controlled substances coming into and going out of Chicago. Odum began to shake upon hearing Gainer's response and then wiped his mouth with the back of his hand. According to Odum, he initially had been willing to answer the agents' questions, but as those questions became more personal, he became hesitant and nervous, and he wished to leave the encounter.

Gainer then asked Odum for permission to search the yellow suitcase. Odum inquired as to what would occur if he refused, and Gainer explained that the suitcase would be detained for a scent search by a trained narcotics detection dog. The agent told Odum that if the search resulted in a positive scent for narcotics, he would apply for a search warrant that would enable him to open the suitcase. If the scent search was negative, however, the suitcase would be mailed to Odum at any address he designated. Thus aware of the implications, Odum refused to consent to a search of the yellow suitcase.[2] Gainer then asked Odum to accompany the agents to their office at the airport so that a receipt for the suitcase could be prepared and Odum's identification verified. Odum agreed and carried the suitcase to the agents' office.

Once in the office, the agents posed additional questions and learned Odum's address and various telephone numbers. They also learned that their suspect's real name was Brandon Odum rather than Brent Owens. When asked about the name on his airline ticket, Odum told the agents that he had not purchased that ticket. When asked who did, Odum gave no response.

The agents then verified Odum's address with his grandmother and prepared a receipt for the yellow suitcase. Before Odum left, the agents asked whether he was carrying a large amount of money. Odum first said "not much," then admitted to having "about $1,500." He then produced two bundles of cash that contained $1,600. The agents returned the cash after counting it, and Odum left the office.

A canine search of Odum's suitcase produced a positive sniff for narcotics. The agents procured a search warrant and discovered approximately 5.8 kilograms of a substance containing cocaine. Odum was arrested and eventually indicted on one count of possessing with the intent to distribute cocaine.

Odum moved to suppress the cocaine as having been procured in violation of the Fourth Amendment. He also requested an evidentiary hearing. The government initially submitted only a brief response to Odum's motion, but the district court struck that response and ordered the government to submit a more complete response, which it did.

The district court subsequently denied Odum's motion without an evidentiary hearing. The court determined that Odum had not been "seized" for purposes of the Fourth Amendment when the agents initially stopped him for questioning near Midway's baggage claim area. The court found that the questioning there was not coercive, that Odum had chosen to cooperate by answering the agents' questions, and that he understood that he was free to refuse to answer and to leave the encounter. The court therefore found that neither probable cause nor reasonable suspicion was necessary to support this consensual interview. That conclusion has not been challenged in this appeal.

The court also found, however, that the consensual interview developed into an investigatory stop, and hence a "seizure" under the Fourth Amendment, once the agents declared that they would detain Odum's suitcase to have it sniffed by a narcotics detection dog. Yet the court concluded that the agents by this time were aware of sufficient facts to create a reasonable suspicion that

---

**2.** Malloy testified that Odum did consent to a search of the black shoulder bag and that he in fact searched the shoulder bag once they arrived at the agents' office. The search did not reveal any narcotics. (Dec. 7, 1993 Tr. at 13, 15.)

Odum was involved in narcotics trafficking. The court pointed to the agents' knowledge: (1) that Odum had paid cash for a one-way ticket from Houston, a source city for narcotics, immediately before the flight's departure; (2) that upon arriving in Chicago, Odum had scanned the concourse as he walked and had looked over his shoulder three times on the way to the baggage claim area; (3) that Odum had been unable to produce any personal identification; (4) that he had become shaky and nervous upon learning the purpose of the agents' questions; and (5) that Odum had been traveling under a different name, which he justified with the explanation that he had not purchased his own ticket without responding to the question of who had purchased the ticket for him. The court found that although any one of these factors may arguably be consistent with the conduct of an innocent traveler, when taken together, they provided a reasonable suspicion that Odum was involved in narcotics trafficking. The court therefore denied Odum's motion to suppress, prompting him to enter a conditional plea of guilt. The district court subsequently sentenced Odum to an imprisonment term of 120 months.

## II.

### A.

■■■ It is by now well-settled that not all encounters between law enforcement agents and private citizens implicate the Fourth Amendment's ban on unreasonable searches and seizures. *See, e.g., United States v. Rodriguez,* 69 F.3d 136, 141 (7th Cir.1995) (citing *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1878 n. 16, 20 L.Ed.2d 889 (1968)); *United States v. Withers,* 972 F.2d 837, 841 (7th Cir.1992). The Supreme Court's pronouncements on the Fourth Amendment implications of various types of encounters have been distilled by this court into the following three categories:

The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a

Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990) (citations omitted), *cert. denied,* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991); *see also United States v. McCarthur,* 6 F.3d 1270, 1275 (7th Cir.1993); *Withers,* 972 F.2d at 841. The district judge assigned Odum's initial discussion with the agents near Midway's baggage claim area to the third category, finding that the encounter was consensual and thus not a seizure under the Fourth Amendment. That determination has gone unchallenged in this appeal, and we find it entirely consistent with our case law. Indeed, we have repeatedly emphasized that there generally is no seizure when a law enforcement agent merely approaches an individual in an airport and, after identifying himself, begins to ask routine questions relating to the individual's identification, travel plans, and ticket information. *See Rodriguez,* 69 F.3d at 141–42; *Withers,* 972 F.2d at 842; *Johnson,* 910 F.2d at 1509; *United States v. Sterling,* 909 F.2d 1078, 1082–83 (7th Cir.1990); *United States v. Edwards,* 898 F.2d 1273, 1276 (7th Cir.1990); *see also Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Moreover, the agent's non-threatening request to search the individual's luggage generally will not convert a consensual interview into an investigatory stop requiring a reasonable suspicion that the person was or is engaged in criminal activity. *See Bostick,* 501 U.S. at 435, 111 S.Ct. at 2386; *Rodriguez,* 69 F.3d at 142; *McCarthur,* 6 F.3d at 1276.

■■■ It is clear, however, that a consensual encounter can develop into an investigatory stop through the conduct of the investigating officers. *See Florida v. Royer,* 460 U.S. 491, 501–02, 103 S.Ct. 1319, 1326, 75

L.Ed.2d 229 (1983) (plurality opinion); *Sterling,* 909 F.2d at 1083. The district court found that to have occurred here once Odum refused to permit a search of the yellow suitcase and the agents declared their intention to detain it for a canine sniff. We agree that at this point, a Fourth Amendment seizure occurred,[3] and the question became whether the agents were then aware of articulable facts sufficient to give rise to a reasonable suspicion that Odum was engaged in narcotics trafficking. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citing *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884). The district court found that they were and refused to suppress the cocaine. Odum argues that the court's finding was in error and, alternatively, that the district court should have conducted an evidentiary hearing before denying his motion.

### B.

■ This circuit reviews the denial of a motion to suppress under a clearly erroneous standard. *McCarthur,* 6 F.3d at 1275. Pursuant to the decision in *United States v. Spears,* 965 F.2d 262, 269–71 (7th Cir.), *cert. denied,* 506 U.S. 989, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992), we have applied that standard to the review of determinations in non-warrant cases that there was reasonable suspicion to support an investigatory stop or probable cause to support a search or an arrest. *See, e.g., United States v. Ornelas–Ledesma,* 16 F.3d 714, 719 (7th Cir.1994); *United States v. Smith,* 3 F.3d 1088, 1090 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994). We thus apply the clearly erroneous standard to the district court's reasonable suspicion finding here, noting, however, that the Supreme Court recently granted certiorari in one of our cases to consider whether *Spears* sets out the correct standard for the review of such a finding in a non-warrant case. *See United States v. Ornelas,* 52 F.3d 328 (7th Cir.1995) (unpublished), *cert. granted,* ——

U.S. ——, 116 S.Ct. 417, 133 L.Ed.2d 334 (1995).

■ In assessing whether an investigatory stop was supported by reasonable suspicion, "we consider the 'totality of the circumstances' as they were presented to the officer at the time of the encounter." *McCarthur,* 6 F.3d at 1277 (quoting *Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585). This "totality" test encompasses the experience of the law enforcement agent and the behavior and characteristics of the suspect. *McCarthur,* 6 F.3d at 1278; *Withers,* 972 F.2d at 843; *Sterling,* 909 F.2d at 1083–84; *see also Sokolow,* 490 U.S. at 10 & n. 6, 109 S.Ct. at 1587 & n. 6. Although the test broadly requires consideration of "the whole picture" presented to the officer (*Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585 (internal quotation omitted)), it is limited to the moment at which the seizure occurred and thus excludes any facts learned thereafter. Regardless of how compelling the later-learned facts may be, they are not part of the "snapshot" presented to the officer at the time of the seizure. They are therefore irrelevant to the reasonable suspicion equation. That much is clear from *Terry* itself, which instructs courts to consider only "the facts available to the officer *at the moment of the seizure or the search.*" 392 U.S. at 21–22, 88 S.Ct. at 1879–80 (internal quotation omitted) (emphasis added).

■ Odum contends that the district court violated that rule here when it emphasized in denying his motion that Odum had been traveling under a different name (Brent Owens), had offered in explanation only the fact that he had not purchased his own ticket, and had failed to respond to further inquiries relating to who had purchased the ticket for him. Odum points out that the agents only obtained this information once they took him to their Midway office to prepare a receipt for the suitcase. The district court found, however, and the government concedes, that a Fourth Amendment seizure had occurred once the agents informed Odum

---

**3.** *See McCarthur,* 6 F.3d at 1276 (consensual encounter developed into investigatory stop when police officer said that luggage would be detained for canine sniff); *Sterling,* 909 F.2d at 1083 (same); *cf. United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (Fourth Amendment seizure occurred when suspect was told that his luggage would be taken to a federal judge so that the agents could secure a search warrant).

near the baggage claim area that they would detain his suitcase for a sniff search. *See, e.g., McCarthur,* 6 F.3d at 1276. Thus, any facts learned by the agents in their office could not be used to support the earlier seizure.

The government concedes, in fact, that the district court's consideration of these facts was improper, and it requests a remand for clarification or reconsideration of the issue by the district court. (Govt.Br. at 12, 14–15.) As we observed above, this court currently reviews a district court's conclusion that there was reasonable suspicion to support an investigatory stop under a clearly erroneous standard. Our *Spears* opinion explains that it is the district court's task to determine whether law enforcement agents had probable cause or reasonable suspicion to support their actions, and that an appellate panel should not substitute its judgment for that of the lower court. 965 F.2d at 271. The Supreme Court will ultimately determine in *Ornelas* whether the *Spears* view is correct, but that decision binds us here, and we agree with the government that it counsels in favor of a remand.

■ There would of course be no reason to remand if Odum is correct in arguing that the circumstances here were insufficient as a matter of law to establish a reasonable suspicion of criminal activity. *See Reid v. Georgia,* 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980) (facts known to law enforcement agent were insufficient to establish reasonable suspicion as a matter of law). Excluding later-learned information, the agents knew by the time of the seizure that Odum: (1) had paid cash for a one-way ticket immediately prior to the departure of a flight from Houston, which is considered a source city for narcotics; (2) had checked a yellow, hard-sided suitcase after asking the ticket agent for cellophane tape and taping the locks on the suitcase; (3) had scanned the concourse upon deplaning in Chicago, looking back over his shoulder three separate times; (4) had been unable to produce personal identification to confirm that he was Brent Owens, the name that appeared on his airline ticket; (5) had himself packed part of the yellow suitcase, which admittedly belonged to him, while his sister had packed the other part; and (6) had initially appeared calm but became nervous and shaky once the agents indicated that they were conducting a narcotics investigation at the airport.[4]

We cannot agree with Odum that the facts known to the agents here were less detailed and therefore less suspicious than the facts found insufficient as a matter of law in *Reid.* The Supreme Court was concerned in that case that three of the four facts relied on by the lower court would apply to "a very large category of presumably innocent travelers," and that only "the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse" related to Reid's particular conduct. 448 U.S. at 441, 100 S.Ct. at 2754; *see also McCarthur,* 6 F.3d at 1278 n. 3.[5] Here, however, a number of the facts that raised suspicions about Odum could not generally be ascribed to innocent travelers. Indeed, it could be considered unusual for an airline traveler to purchase a one-way ticket for cash immediately before his flight, to tape

---

4. The government emphasizes one additional fact that apparently raised the agents' suspicions, although the district court never mentioned this fact in its opinion. (*See* Govt.Br. at 7 n. 5) The government submits that once the agents learned that Odum had no personal identification, Gainer inquired of the reason for Odum's travel to Houston. Odum apparently indicated that he had been visiting, but he did not reply when asked who he had been visiting. This alleged fact was recited in the government's response to Odum's suppression motion (R. 28 at 4), but the government cited no evidence that would establish this fact. We have scoured the evidentiary materials before the district court without finding any mention of this exchange.

5. The lower court in *Reid* had relied on the following four facts in determining that there was reasonable suspicion to conduct an investigatory stop:

> (1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags.

448 U.S. at 441, 100 S.Ct. at 2754.

the locks on a checked suitcase, to conduct countersurveillance in walking through an airport concourse, and to travel without any personal identification. *See United States v. Foster*, 939 F.2d 445, 449–50 (7th Cir.1991) (listing travel habits of drug couriers); *see also McCarthur*, 6 F.3d at 1278 (train ticket had been purchased with cash and suspect claimed to have no personal identification); *Sterling*, 909 F.2d at 1084 (suspect conducted countersurveillance after deplaning and produced no identification). The fact, moreover, that Odum initially appeared calm but became visibly nervous when told that the agents were conducting a narcotics investigation is relevant to the reasonable suspicion inquiry. *See McCarthur*, 6 F.3d at 1278; *United States v. Adebayo*, 985 F.2d 1333, 1340 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993); *Withers*, 972 F.2d at 843; *Johnson*, 910 F.2d at 1510; *Edwards*, 898 F.2d at 1277. We thus cannot say that the facts known to the agents at the time of the seizure were insufficient as a matter of law to give rise to a reasonable suspicion that Odum had been or was engaged in narcotics trafficking. *Cf. Royer*, 460 U.S. at 502, 103 S.Ct. at 1326; *Sterling*, 909 F.2d at 1084; *United States v. Sullivan*, 903 F.2d 1093, 1097 (7th Cir.1990); *United States v. Skidmore*, 894 F.2d 925, 928 (7th Cir.1990); *United States v. Teslim*, 869 F.2d 316, 322 (7th Cir.1989). Our conclusion that the facts known to the agents were not insufficient as a matter of law should not be read to limit the district court's discretion on remand.

### C.

Odum finally contends that his motion to suppress should not have been denied without an evidentiary hearing. He argues first that a hearing was necessary to enable him to establish that he had been targeted by the agents for an investigative stop even before they arrived at Midway. He also maintains that a hearing was necessary to determine how much time elapsed after the agents seized the yellow suitcase and before they subjected it to a sniff search. Although the district court is free to conduct an evidentiary hearing on remand, we cannot say that the court would clearly err in resolving Odum's motion without such a hearing. *See Rodriguez*, 69 F.3d at 140–42. The agents came to Midway with the obvious intention of investigating the information imparted to them by Officer Maxwell in Houston, and any proof Odum could muster to support his "targeting" theory would not require suppression of the cocaine so long as the agents' reasonable suspicions about Odum were based on specific and articulable facts. *Cf. Johnson*, 910 F.2d at 1509 (reliance on drug courier profile to single out suspect for questioning was not improper); *see also Rodriguez*, 69 F.3d at 142.

The district court also was not required to conduct an evidentiary hearing to determine the length of time Odum's suitcase was detained before it was submitted to a sniff search. Although it is clear that the duration of an investigatory stop may abridge constitutional standards even where there is reasonable suspicion to support it (*see United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983); *Sterling*, 909 F.2d at 1078), Odum did not argue below that the agents had not been diligent in submitting his suitcase to a canine sniff. Because he failed to raise the issue at all, his motion did not demonstrate a material factual dispute that required a hearing for resolution. *See Rodriguez*, 69 F.3d at 141. As a result, the district court did not clearly err in resolving his motion without a hearing.

### III.

Because the district court relied on improper facts in concluding that law enforcement agents had sufficient information to produce a reasonable suspicion that Odum had engaged or was engaging in criminal activity, we remand to enable the district court to reconsider that question without reference to the improper facts.

REMANDED.