**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gerald H. THOMAS, Defendant–Appellant.**

No. 95–2058.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1996.

Decided July 1, 1996.

As Amended July 8, 1996.

Barry Rand Elden, Chief of Appeals, Patrick Collins (argued), Office of the U.S. Atty., Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Standish E. Willis (argued), Chicago, IL, for Defendant–Appellant.

Before COFFEY, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Gerald Thomas was charged with possessing cocaine with intent to distribute. He filed a motion to suppress the evidence—the cocaine—which the district court denied after a hearing. Because he had no defense to the charge once the admissibility was assured, he pleaded guilty, reserving his right to challenge the evidentiary ruling on appeal. We affirm.

On March 19, 1993, Thomas arrived at Midway Airport at about 9:00 a.m. Officers Carlos Mostek and Ken Krok and Special Agent Gary Bortlein, all of the Drug Enforcement Administration Chicago Transportation Interdiction Task Force, were waiting for him. They had received a tip that a Black male wearing a jacket with the letters USA on the back had purchased a one-way ticket from Los Angeles to Chicago, with cash, on flight No. 378. They were also told that the man had been evasive with the ticket agent about his identification and that he had appeared nervous. When the flight arrived, Mostek and Krok watched Thomas, who matched the description they had been given, walk to the TWA baggage claim area. Bortlein continued to check to see if any other passenger fitting the description had deplaned.

As Thomas walked through the airport, he looked around frequently. He asked a TWA agent when the bags were going to arrive, and then he bought a cup of coffee. By then the bags were there, and he picked up his suitcase from the carousel. As he walked toward the exit, Mostek and Krok approached him from behind. Mostek identified himself as a police officer, displayed his credentials, and asked if Thomas would be willing to speak with them. Krok stood off to one side, and Bortlein joined the group some time later. After examining Mostek's credentials, Thomas agreed to talk.

In reply to Mostek's questions, Thomas volunteered that he had come in from Los Angeles, and he showed a copy of his ticket to Mostek. Mostek then inquired whether Thomas had any identification, and Thomas gave him a California driver's license. At that point in the conversation, Thomas said that he had lived in Los Angeles all his life and that he was going to be in Chicago for a few weeks visiting his mother and sisters. Matters then became more confused. When Mostek asked Thomas when his mother had moved to Chicago, Thomas replied that she had always lived in Chicago. Mostek then

asked Thomas when he moved to Los Angeles, and Thomas said that he had gone to school in Chicago. Mostek then asked Thomas if he had been born in Chicago, and Thomas answered that he had been born in Mississippi.

During the course of this brief encounter, the officers observed that Thomas was extremely nervous. His hands were shaking to the point that the coffee he was holding almost spilled, and he began to breathe heavily. He made no eye contact with the officers. When the initial conversation concluded, Mostek thanked Thomas for his cooperation and told him that he was not under arrest. Mostek explained that he and his partners were narcotics investigators at Midway Airport, and that they regularly stopped travelers who might be carrying narcotics. Zeroing in at last on the suitcase, Mostek asked Thomas if he was the owner, and Thomas replied in the affirmative. Mostek asked the now-standard question whether anyone in Los Angeles had given him anything to carry, and he said no. Mostek asked what was in the bag, and Thomas replied that it contained nothing but clothes. Finally, Mostek asked if he could search the bag, and Thomas refused permission.

Mostek then asked Thomas for his driver's license so that he could give him a receipt for the bag. He informed Thomas that he was going to call for a dog to sniff the bag for drugs. Thomas turned over the driver's license for the second time, and Mostek inquired whether he still lived at the address on the license. Thomas answered that he lived there with his mother. Mostek reminded Thomas that he had just indicated that his mother lived in Chicago, to which Thomas responded that only his mother's sisters lived in Chicago. When Mostek asked for a local Chicago address where he could be reached if the sniff was negative, Thomas said he planned to wait until the sniff was completed. Thomas then told Mostek that he was going to be picked up by someone at the airport, but Mostek then saw him climb into the first available cab. The subsequent sniff and search of the bag turned up about 1 kilogram of cocaine, which led to the conviction noted above.

As we noted recently in *United States v. Odum*, 72 F.3d 1279 (7th Cir.1995), not all encounters between law enforcement agents and private citizens implicate the Fourth Amendment's ban on unreasonable searches and seizures. An initial consensual encounter, "when a law enforcement agent merely approaches an individual in an airport and, after identifying himself, begins to ask routine questions relating to the individual's identification, travel plans, and ticket information," *id.* at 1283, is not a seizure for Fourth Amendment purposes. The more difficult questions arise when a consensual encounter develops into an investigatory stop, as we used the term in *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied*, 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991). At that point, whenever it is, a Fourth Amendment seizure occurs, and the question becomes whether the agents then had a reasonable suspicion based on articulable facts that something was amiss. *Odum*, 72 F.3d at 1283–84. See *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

In this case, the initial encounter between Thomas and the three officers was consensual, as our cases use the term. Mostek did not need "reasonable suspicion" or anything else in particular in order to approach Thomas and ask him the series of question about why he was in Chicago, where he was going, and where he was from. See *United States v. DeBerry*, 76 F.3d 884 (7th Cir.1996); *United States v. McCarthur*, 6 F.3d 1270, 1276 (7th Cir.1993); *United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir.), *cert. denied*, 508 U.S. 966, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993). The question for us is whether the district court erred in deciding that the remainder of the encounter, after Mostek informed Thomas that he was going to detain the suitcase for the "sniff," was supported by reasonable suspicion. *Ornelas v. United States*, —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In reviewing the district court's determination *de novo*, we must "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those

facts by resident judges and local law enforcement officers." *Id.*

In reviewing the lower court's decision, we rely only on information that was available to the officers at the time the seizure occurred. *Odum,* 72 F.3d at 1284–85. As we pointed out in *Odum,* only those facts could have supported the officer's determination that there were grounds to detain the suitcase. Looking at the facts as they appeared to the officers at the time to see if the investigatory stop was supported by reasonable suspicion, the district court was required to consider the totality of the circumstances. *McCarthur,* 6 F.3d at 1277.

Here, the totality of the circumstances were enough to raise a reasonable suspicion in the officers' minds about the lawfulness of Thomas's activities. In reviewing the evidence as a whole, we do not mean to suggest that any one factor alone would be suspicious. Only when they were combined did they justify the modest investigatory detention of Thomas's suitcase for purposes of the "sniff" test. The officers knew a number of facts about Thomas. A man matching Thomas's description had bought a one-way ticket from Los Angeles with cash. No one else on the airplane matched that description. Thomas was nervous as he moved through the airport, and became even more nervous when the officers initiated a conversation with him, practically spilling his coffee in the process. Perhaps most importantly, Thomas gave contradictory answers to simple questions about his family, his residence, and the purpose of his trip. The officers were entitled to conclude that a person would know whether he had lived in Los Angeles all his life, or if he had spent significant time in Chicago and Mississippi—a point on which Thomas contradicted himself during the initial conversation.

The stop did not become an investigatory stop until Thomas refused to give his consent to a search of the suitcase and Officer Mostek told Thomas that he was nevertheless going to detain the suitcase briefly so that a police dog could sniff it for narcotics. To be sure, after that moment, Thomas said (and did) a number of things that may have reinforced the DEA team's suspicions that they had found someone with illegal drugs. But, as discussed above, those facts play no role in our analysis. The officers reasonably suspected that Thomas was committing a crime and, therefore, they had a valid reason to detain the suitcase. Of course, once the dog reacted positively for narcotics, the officers had probable cause to obtain a search warrant for the suitcase, and, with it in hand, they lawfully found the kilogram of cocaine.

The underlying facts that the district court found, on matters like Thomas's demeanor during his walk through the airport and throughout the initial conversation, and the content of the conversation, find ample support in the record as it has come to us. We note, however, that the appellant appears to have violated Circuit Rule 30(a) by failing to include in his brief the transcript of the district court's discussion of the suppression issue. This in itself can be grounds for waiving the right to appeal from those matters, particularly in civil cases. *Urso v. United States,* 72 F.3d 59, 61–62 (7th Cir. 1995). In criminal cases, in contrast, the sanction for violating Circuit Rule 30(a) generally falls on the attorney. *Guentchev v. I.N.S.,* 77 F.3d 1036, 1039 (7th Cir.1996). We did not vet this problem at oral argument, and both sides adequately explained the district court's reasons for denying the motion to suppress, so no harm was done. We, therefore, will not ask Mr. Willis to explain the omission. Nonetheless, we reiterate for the future that effective appellate review can be hampered, or even precluded, when Circuit Rule 30(a) is ignored. Based on the record before us, we have addressed Thomas's arguments on the merits, and, finding no error, we AFFIRM the judgment of the district court.