In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1809

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DENNIS S. GOODWIN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 270—**John F. Grady**, *Judge*.

ARGUED JANUARY 17, 2006—DECIDED MAY 24, 2006

Before CUDAHY, POSNER, and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.*  The defendant pleaded guilty to possession of the illegal drug Ecstasy with intent to distribute it and was sentenced to 60 months in prison. He reserved the right to appeal the denial of his motion to suppress the drugs seized from him in the course of what the parties inexactly describe as a *"Terry* stop."

He had reserved a one-way train ticket from Chicago to Denver the day before, and bought the ticket with cash only an hour before, the train's scheduled departure from Union Station. This pattern—last-minute cash purchase of a one-

way ticket—is deemed by enforcers of the drug laws to be the profile of a drug courier, *United States v. Johnson*, 910 F.2d 1506, 1507 (7th Cir. 1990), though not to establish probable cause or even reasonable suspicion to believe that someone who fits the profile *is* a drug courier. The profile is used merely as a basis for deciding whom to investigate further.

Three members of a drug task force assigned to Union Station, having learned from the passenger manifest that the defendant fitted the profile, decided to try to interview him. They boarded the train at 2:30 p.m., five minutes before it was scheduled to depart, and found the defendant sitting in his sleeping compartment. Standing in the corridor they asked him whether he was willing to answer some questions, and he said yes. One of the officers asked him for his ticket and identification, and the defendant handed the documents to him. The officer asked him whether he was carrying weapons, narcotics, or large amounts of money, and he answered no. The officer noticed that the defendant had two pieces of luggage with him, and asked him whether he'd let him look inside the bags. The defendant refused. The officer asked him whether there was any money in the luggage. The defendant said there was and the officer again asked whether he could look inside, to which the reply was that the bags were locked and the defendant had lost the key. The officer offered to open the bags without damaging them but the defendant refused. A couple of minutes had passed since the officers had first approached him. The officer who had been questioning him was still holding the defendant's ticket and ID.

The officers' suspicions, founded initially on the defendant's fitting the profile of a drug courier, were heightened by the improbable story of the lost key—had the defendant

indeed lost the key and had nothing incriminating in his bags, he would have welcomed the offer to open them without damaging them. The officers decided to seize the bags. They didn't arrest the defendant—indeed they assured him he wasn't under arrest—but they did ask him to accompany them to the police office so that they could give him a receipt for his luggage, and he agreed. (He didn't ask them why they couldn't give him a receipt on the spot.) While they were walking to the office, the train left. There is only one train daily from Chicago to Denver.

When they arrived at the police office, the officers told the defendant that they were going to summon a dog to sniff the luggage and if the dog "alerted" they would then get a warrant to search the luggage. At this point, knowing the jig was up, the defendant gave the officers the key. They opened the luggage and in one of the bags found a large amount of money and some Ecstasy. They arrested the defendant and put the money and the drugs back in the bag and closed it. The dog arrived (it's unclear when he had been sent for or how long it had taken him to arrive) and went wild when he smelled the bag. The purpose of the dog test, after the police knew what the bag contained, was to set the stage for an "inevitable discovery" argument in the event a judge found that the defendant's consent to the search of the bag had not been voluntary. *Segura v. United States*, 468 U.S. 796, 813-14 (1984); *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Blackwell*, 416 F.3d 631, 633 (7th Cir. 2005). We shall not have to reach the issue of consent.

The government argues and the district judge agreed that the initial questioning of the defendant was not a "seizure" within the meaning of the Fourth Amendment, and that is undoubtedly correct. Seizure of a person implies

restricting his freedom of movement. That didn't happen until the officers and the defendant left the sleeping compartment. Until then he was where he wanted to be. It was as if he'd been walking down the street and the police had fallen in step with him and asked him questions without causing him to alter his pace or his path. Such encounters are not pleasant, but they are not seizures until they impede the individual's freedom of motion.

It is true that the police officer to whom the defendant had handed his identification and ticket was still holding these items when the defendant's fishy "lost key" story carried the suspicion that had been aroused by his fitting the drug profile over the line that separates bare suspicion from reasonable suspicion. But the interval was too brief to amount to a seizure of the defendant (compare *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995)) and anyway it is not a seizure to prevent a person from moving who doesn't want to move. This was well explained in *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991): "When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking. But when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter. Here, for example, the mere fact that Bostick did not feel free to leave the bus does not mean that the police seized him. Bostick was a passenger on a bus that was scheduled to depart. He would not have felt free to leave the bus even if the police had not been present. Bostick's movements were 'confined' in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police

conduct at issue was coercive." See also *United States v. Childs*, 277 F.3d 947, 951 (7th Cir. 2002) (en banc).

The combination of fitting the drug profile and giving a suspicious answer to the question about looking inside his luggage created a reasonable suspicion that the defendant's luggage contained contraband. *United States v. Sterling*, 909 F.2d 1078, 1083-84 (7th Cir. 1990); *United States v. Bayless*, 201 F.3d 116, 132-34 (2d Cir. 2000). The police also "stopped" the defendant: By telling him to accompany them to their office to get a receipt for the luggage while holding on to his ticket and identification they forced him out of the train and, given the proximity of its departure, marooned him in Chicago for 24 hours. If the "stop" of the luggage was lawful, doubtless so was the stop of him, as there was no reason to think him an unwitting courier of contraband; his conduct was all against that inference. But even if stopping him was unlawful and might therefore support a damages suit, it had no consequences for the criminal proceeding against him. For once the police had the luggage and submitted it to a dog sniff, they had what they needed. If the luggage was lawfully seized and retained for the time it took to do the sniff, there was no basis for excluding it as evidence of a drug crime.

*Terry v. Ohio*, 392 U.S. 1 (1968), authorized the common police practice of stopping a person who is behaving in a suspicious manner to question him briefly and, if the officers are worried that he may be armed, patting him down. So: "stop and frisk." All that is required is that the officers' suspicion be "reasonable." To "stop" a piece of luggage and interrogate it with a dog's nose fits the principle though not the facts of *Terry*, and was held to be a proper application of the underlying principle in *United States v. Place*, 462 U.S. 696, 703-06 (1983). That principle is

that the less protracted and intrusive a search or seizure is, the less suspicion the police need in order to be allowed to conduct it. *United States v. Burton*, 441 F.3d 509, 511 (7th Cir. 2006). "It does not follow that because an officer may lawfully arrest a person only when he is apprised of facts sufficient to warrant a belief that the person has committed or is committing a crime, the officer is equally unjustified, absent that kind of evidence, in making any intrusions short of an arrest." *Terry v. Ohio*, *supra*, 392 U.S. at 27. When the officers in the present case removed the defendant's luggage from the train they "stopped" the luggage from going to Denver, but they had a reasonable suspicion that the luggage contained contraband and that is all that is required for a *Terry* stop or its luggage equivalent. But we cannot end our analysis here. We shall have to explore further the principle that underlies the *Terry* and *Place* decisions.

To begin with, the amount of permissible intrusion is a function not only of the likelihood of turning up contraband or evidence of crime but also of the magnitude of the crime being investigated. In *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000), the Supreme Court remarked that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack." And in *Florida v. J.L.*, 529 U.S. 266, 273-74 (2000), it said that "we do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk." In other words, if the crime being investigated is grave enough, the police can stop and frisk without as much suspicion as would be required in a less serious criminal case.

This "sliding scale" approach is further illustrated by *Illinois v. Lidster*, 540 U.S. 419 (2004), where the Court

upheld a roadblock that the police had set up to stop cars so that the drivers could be asked for information about a recent hit-and-run accident. Not only was there no individualized suspicion, reasonable or otherwise, of the persons stopped; there was no group suspicion, as there had been in *Edmond*. The purpose of the roadblock in *Lidster* was not to stop the hit-and-run driver but to obtain information that might lead to his being apprehended elsewhere. Yet the roadblock did not violate the Fourth Amendment. One factor the Court emphasized was that the stop was much less intrusive than an arrest or a conventional search.

Ordinarily the detention of a piece of luggage merely to permit a dog to sniff it is even less of an intrusion than a stop and frisk or being stopped at a roadblock—the only information that the sniff reveals is the presence of contraband, in which the possessor has no legally protected interest. *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005); see also *United States v. Jacobsen*, 466 U.S. 109, 122-23 (1984); *United States v. Place*, *supra*, 462 U.S. at 707. But the intrusion in this case was greater than in a standard stop and frisk. If you ask the average person whether he would rather be stopped for five minutes, questioned, and frisked, or be delayed in a journey to another city by 24 hours, he will probably, unless extremely squeamish, choose the former. Yet there could be cases in which even a brief stop and frisk caused someone to miss a plane or train, and would such a consequence invalidate the *Terry* stop? Is *more* than reasonable suspicion, which as we said was present here, required in such a case because the interference with the defendant's freedom of movement is so much greater than in the typical *Terry* stop or its luggage equivalent?

An argument that more suspicion is required might point to a study of *Terry* stops in New York City which found that only one in nine had resulted in an arrest.

William J. Stuntz, "O.J. Simpson, Bill Clinton, and the Transsubstantive Fourth Amendment," 114 *Harv. L. Rev.* 842, 873 and n. 99 (2001). Doubtless some of the people stopped were not arrested simply because the police had better uses of their time, but others were not arrested because they had been stopped by mistake. If a stop, whether of the individual or of his luggage, results in stranding an innocent person for hours, considerable hardship will have been inflicted without any countervailing benefit to the community. The sliding-scale approach implies, and our decision in *United States v. Chaidez*, 919 F.2d 1193, 1197-98 (7th Cir. 1990), holds, that the more costly the stop to the person stopped, the greater must be the expected benefits of the stop to law enforcement for the stop to be reasonable.

In other words, the scale slides in both directions. A stop as unintrusive as the one in *Lidster*, or as brief as when a police officer by "approaching a person on the street (or at work, or on a bus) to ask him a question causes him to stop for at least the time needed to hear the question and answer (or refuse to answer)," *United States v. Childs*, *supra*, 277 F.3d at 950, requires no suspicion to be lawful. But as emphasized in *Chaidez*, if the stop is more oppressive than the standard *Terry* stop, more suspicion may be required than is required for such a stop. And that may seem to make the case for the defendant—for being marooned for 24 hours can be a considerable hardship. But two other factors in this case cut against him: the lack of feasible alternatives to the stop, and the fact that the risk of delay and consequent hardship was created by the defendant himself.

The suspicion required to justify a search is relative to alternative means of investigation. Officers who encounter a person who is behaving in a suspicious manner, but who do not have enough suspicion to justify a stop, may

be able to take further steps to confirm or allay their suspi-
cion, perhaps by following the suspect. So we must consider
whether the police in this case might have conducted a
further investigation of the defendant that would not have
entailed delaying his trip by 24 hours. They could have
brought the sniffer dog onto the train with them or let the
defendant and his luggage continue to the next station but
call ahead and have a dog waiting there. However, these
would not have been satisfactory alternatives to seizing the
luggage. A sniffer dog might not do his stuff in the unfamil-
iar setting of a train's interior. And apparently there aren't
enough of these highly trained dogs to have one tethered at
every bus station, train station, and airport in Chicago. As
for the officers' calling ahead, the defendant could have
dumped the incriminating contents of his luggage out of the
window of his compartment between Chicago and the
train's next stop. And there is no suggestion that the police
deliberately delayed bearding the defendant in his den until
the last minute so that he would miss his train. They got
there as soon as they could—for remember that the defen-
dant had bought his ticket only an hour before the train was
to leave. They could have had a receipt for the luggage with
them and given it to the defendant on the train and let him
proceed on his way without his luggage, but few people
would be willing to continue an out-of-town trip without
any of their luggage.

If the defendant had bought his ticket a week in advance
and the police had known then that he fit the profile of a
drug courier, they could have arranged for Dusty (the
sniffer dog) to be at Union Station when the train was
scheduled to depart. But because the defendant bought his
ticket only an hour before the scheduled departure, the
police had until then no ground for suspicion. Their only
options at that point were to risk causing the defendant to

miss his train or abandon the investigation. To say that it was unreasonable for them to choose the former course of action would make last-minute ticket purchases a foolproof way for drug couriers to frustrate profiling. As the court said in *United States v. Sharpe*, 470 U.S. 675, 686-88 (1985), if "the police are acting in a swiftly developing situation, . . . the court should not indulge in unrealistic second-guessing. . . . The delay in this case was attributable almost entirely to the evasive actions of Savage, who sought to elude the police as [the defendant] moved his Pontiac to the side of the road." See also *United States v. Van Leeuwen*, 397 U.S. 249, 252-53 (1970), upholding a 29-hour retention of a seized package. Compare *Florida v. Royer*, 460 U.S. 491, 504-06 (1983) (plurality opinion).

This case is an illustration of how "the need for a stop depends on factors such as the seriousness of the offense suspected, *the consequences of delay on the part of the officers*, and the likelihood of the detainee's involvement in the offense suspected . . . . [T]he need for a stop increases if the departure of a suspect from the area reasonably appears to be imminent." *United States v. Price*, 599 F.2d 494, 500 (2d Cir. 1979) (emphasis added); see also *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995). As the Supreme Court explained in *United States v. Place*, *supra*, 462 U.S. at 705-06, one thing that makes a stop less costly to the person stopped than an arrest is the stop's brevity, and one thing that makes prolonging the stop more difficult to justify is the existence of a feasible alternative. Since the police knew Place's scheduled time of arrival at the airport they could have arranged to have a sniffer dog there when Place arrived. Having failed to make such an arrangement they detained his luggage for an hour and a half before the sniff. The Court held that that was too long, no excuse for the delay having been offered. Here there was a good excuse, as we

have seen, and though the delay was longer than in *Place*, the Court had been explicit in "declin[ing]" to adopt any outside time limitation for a permissible *Terry* stop." *Id*. at 709. Ninety minutes was merely too long "on the facts presented by th[e] case," where the police "had ample time to arrange for their additional investigation at [the airport], and thereby could have minimized the intrusion on [Place's] Fourth Amendment interests." *Id*. at 709-10. They didn't here.

The detention (as distinct from the delay that resulted from the defendant's missing his train) was shorter in the present case than in *Place*, though it is unclear how much shorter. The interval between the seizure of the luggage and the sniffing by the dog must have been at least 20 minutes. The government's lawyer at argument said the interval was "half an hour" and he was not contradicted. But the defendant's lawyer had no rebuttal time left (though he could have asked leave to file a supplemental brief or memo, and did not), and we cannot find any support in the record for the half-hour estimate. But these are details; for even if the interval could have been compressed to 10 minutes, the damage would have been done; the defendant would have missed his train, and it is the resulting 24-hour delay that he is complaining about.

We do not think that such a consequence, if as a practical matter it is unavoidable because of a decision by the defendant himself (to buy his ticket at the last minute), invalidates an investigative stop. It is not as if the police had locked him up for 24 hours. By buying his ticket at the last minute he created a situation in which even a brief stop would cause him to miss his train, because the stop was bound to occur at the last minute—the police could not fit him to the profile until he bought his ticket. He was there-

fore the co-author of the prolongation that is the fulcrum of his Fourth Amendment claim. If his missing his train invalidated the seizure of his luggage, drug couriers have discovered an infallible means of defeating law enforcement—buy your ticket at the last minute. The thinking behind the profile would have been vindicated, but at the cost of making drug-courier profiling next to useless to the police.

It is not as if the defendant had bought a one-way ticket with cash a full week before the train's departure, but had boarded it (and met the police) only 10 minutes before departure. The purchase of a one-way ticket for cash might have alerted the police to the possibility that the defendant was a drug courier, and then, as we noted earlier, they could have arranged for Dusty to meet him on the platform, as it were. By delaying his purchase to the last minute, the defendant created suspicion at a time when a police investigation was bound to delay his departure. It is in that sense that he is the author of the delay of which he complains.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*