NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 12, 2006
Decided March 5, 2007

**Before**

Hon. FRANK H. EASTERBROOK, *Chief Judge*

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| No. 06-1630 | Appeal from the United States District Court for the Northern District of Indiana, |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | South Bend Division. |
| *v.* | No. 05 CR 101 |
| DORIAN HARRIS, *Defendant-Appellant.* | Robert L. Miller, Jr. *Chief Judge.* |

## O R D E R

Dorian Harris pleaded guilty to possession of ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). As permitted by his plea agreement, Harris now appeals the denial of his motion to suppress the ammunition that led to his conviction. Harris contends that the South Bend officer who stopped and frisked him acted on a hunch, not reasonable suspicion, and the .22-caliber rounds recovered from his pocket during the frisk should have been suppressed. We disagree and affirm.

## I. Background

On March 19, 2005, the South Bend Police Department dispatched one of its

veteran officers, Corporal Alan Delinski, to patrol the city's northwest quadrant. Delinski was a member of a special community-policing task force, and the department had decided to focus its patrol efforts in the northwest part of the city in response to citizen complaints of prostitution, open-air drug dealing, and burglary in that area. On the afternoon of March 19, Delinski was in his marked police cruiser driving south on North Sherman Street as he slowly passed Dorian Harris, who was on the sidewalk walking north. When Harris spotted the cruiser, he abruptly changed direction, left the sidewalk, and walked away from the street across a muddy yard toward the front door of a private residence. As he walked, he continuously looked over his shoulder at the cruiser and kept both hands in his pockets. Upon reaching the front door, Harris feigned knocking with his right hand, keeping his left hand in his pocket.

His suspicion aroused, Delinski made a U-turn, parked, and approached Harris on foot via the house's cement front walkway. As Delinski started walking toward the porch, Harris began actually knocking on the door. When Delinski reached the porch, he asked Harris if he knew who lived at the residence. Harris replied that his baby's mother lived there. Delinski asked Harris to take his hand out of his pocket and step off the porch. Harris turned to face Delinski, took a couple of slow steps, and then jumped off the porch toward Delinski without removing his hand from his jacket pocket. In response to this combination of odd behaviors, Delinski frisked Harris for weapons and discovered twenty-two live .22-caliber bullets.

After confiscating the ammunition, Delinski asked Harris if he had ever been convicted of a felony, and Harris answered, "Yes." At this point a woman appeared at the front door and addressed Harris by his first name. Delinski then informed Harris that it was a federal crime for felons to possess ammunition. The woman asked what was going on, and Delinski replied that he would speak with her after finishing with Harris. The South Bend Police Department ultimately referred the matter to federal law enforcement officials.

Harris was charged with one count of possession of ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). Harris moved to suppress the ammunition on the grounds that Delinski did not have reasonable suspicion to stop and frisk him. The district court denied the motion, holding that both the stop and frisk passed muster under the Fourth Amendment. As to the stop, the district court held that the totality of the circumstances known to Delinski—the abrupt, evasive walk across a muddy yard; prolonged eye contact; pantomime knocking; persistent hand in pocket; and the neighborhood's reputation for drug dealing and burglary—justified a brief and limited investigative detention of Harris. As to the frisk, the court concluded that Harris's hand-in-pocket jump off the porch justified a defensive frisk of Harris for weapons. Harris then entered into a conditional guilty plea agreement in which he preserved the right to appeal the denial of his motion to suppress.

## II. Discussion

Harris's main argument on appeal is that Delinski's stop-and-frisk was based on nothing more than an inchoate hunch, falling short of the particularized suspicion needed to justify a Fourth Amendment seizure and frisk for weapons under *Terry v. Ohio*, 392 U.S. 1 (1968). He contends that his change of direction, prolonged eye contact, and mock knocking did not raise a reasonable suspicion that criminal activity was afoot or that he might be armed and dangerous.

We review de novo whether Delinski acted on the basis of suspicion sufficient to justify the *Terry*-style seizure that occurred. We must decide whether specific and articulable facts known to the officer at the time of the stop reasonably warranted a brief investigative detention of Harris. *United States v. Johnson*, 383 F.3d 538, 542 (7th Cir. 2004); *United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir. 1997). A frisk for weapons is justified under *Terry* if the officer has reason to believe the person he has stopped may be armed and dangerous. *Rivers*, 121 F.3d at 1045.

## A. The Stop

A *Terry* stop lies somewhere between a consensual encounter and a full-blown custodial arrest. When police officers reasonably suspect wrongdoing but lack probable cause to make an arrest or obtain a warrant, they may briefly detain an individual to verify or dispel their suspicions. *Terry*, 392 U.S. at 21. When involuntary, such detentions are Fourth Amendment "seizures" and thus must be reasonable at their inception and in their scope. *See United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). A *Terry*-style seizure is reasonable at its inception if the totality of the circumstances, including the officer's experience, would lead him to reasonably suspect wrongdoing. *United States v. Goodwin*, 449 F.3d 766, 769 (7th Cir. 2006); *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000).

Corporal Delinski's suspicion that Harris may have been involved in wrongdoing was both reasonable and particularized. Delinski, an experienced police officer, was assigned to patrol northwest South Bend in direct response to citizen complaints of open-air drug dealing, prostitution, and burglary in the neighborhood. When Harris spotted Delinski's marked police cruiser, he did an immediate and abrupt about-face and walked across a muddy yard despite an available and cleaner alternative route—the home's cement walkway. Delinski testified at the suppression hearing that the mud would have deterred an average person from walking through the yard. This type of nervous or evasive behavior is certainly suspicious, *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000), even more so given the recent reports of drug dealing, prostitution, and burglary in the area. *See United States v. Baskin*, 401 F.3d 788, 791-92 (7th Cir. 2005) (evasive conduct in an

area of expected criminal activity justifies a *Terry* stop); *United States v. Quinn*, 83 F.3d 917, 922 n.2 (7th Cir. 1996) ("[C]ourts may consider the defendant's presence in a high crime area as part of the totality of circumstances confronting the officer at the time of the stop.").

But we need not decide whether Harris's evasive behavior itself justified a *Terry* stop because Delinski described additional suspicious circumstances that supported the stop. Delinski testified that as Harris walked across the muddy yard, he continuously looked over his shoulder at the cruiser and kept his hands in his pockets. Then came the odd pantomime knocking on the front porch. These combined facts justified a brief investigative detention. Delinski asked Harris if he knew who lived at the house, and Harris responded that his baby's mother lived there. Delinski apparently did not accept this response at face value. That the officer later heard the woman who emerged from the home address Harris by name does not undermine reasonable suspicion; we confine our inquiry to the facts known at the time of the seizure. *United States v. Odum*, 72 F.3d 1279 (7th Cir. 1995).

Viewed in isolation, Harris's prolonged eye contact, pocketed hands, and mock knocking may have been innocent enough. *See United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) (explaining that eye contact is relevant to reasonable suspicion but not necessarily determinative). But when combined with his nervous and evasive behavior in an area known for open-air drug dealing and burglary, the circumstances were sufficiently suspicious to justify Delinski's request that Harris step off the porch for further questioning. Moreover, the detention only minimally intruded on Harris's privacy—he was not handcuffed, forced into the cruiser, or otherwise detained for a prolonged period—and thus it is justified by less suspicion than needed for a more protracted or intrusive search or seizure. *Goodwin*, 449 F.3d at 769 ("The principle is that the less protracted and intrusive a search or seizure, the less suspicion police need in order to be allowed to conduct it.").

To be clear, Delinski needed no justification, reasonable suspicion or otherwise, to approach Harris on the front porch of the home and ask him if he knew the person who lived there. Porches and walkways carry an implied license for public use, RESTATEMENT (SECOND) OF TORTS § 330 cmt. e (1965), meaning Delinski's initial interaction with Harris resembled a consensual police-citizen encounter on a public sidewalk. Harris arrived at the porch of his own volition; Delinski in no way chased or corralled him there.[1] And when Delinski got out of his

---

[1] Harris makes the strange claim that Corporal Delinski may have provoked Harris's evasive behavior by driving slowly. He thus concludes that Delinski used Harris's about-face as a mere pretext for the stop-and-frisk. This claim is factually and legally flawed. First, the record is bare of any evidence that Delinski baited Harris into abruptly changing

(continued...)

car, approached the house, and asked Harris who lived there, Delinski had done nothing to restrict Harris's freedom of movement, that is, to "seize" him. As we recently explained, "such encounters are not pleasant, but they are not seizures until they impede the individual's freedom of motion." *Goodwin*, 449 F.3d at 768. In short, Delinski did not seize Harris until he ordered him off the porch. The stop was based on adequate reasonable suspicion.

## B. The Frisk

Reasonable suspicion of criminal activity does not automatically entitle police to frisk an individual during a *Terry* stop. *See Rivers*, 121 F.3d at 1045. Only where police have reason to believe they might be dealing with an armed and dangerous person may they conduct a defensive frisk—that is, a noninvasive pat-down of the outer clothing to check for weapons. *Id.* The officer's suspicion that the individual is armed and dangerous must be based on specific and articulable facts. *Brown*, 188 F.3d at 864-65.

Corporal Delinski had reason to believe Harris may be armed and dangerous. He testified that after he told Harris to remove his hand from his pocket and step off the porch, Harris slowly and hesitantly turned around. Harris then jumped off the porch toward Delinski without removing his left hand from his pocket. Given this behavior, the reports of criminal activity in the area, and Harris's prior nervous and evasive conduct upon spotting Delinski's police cruiser, the frisk for weapons was justified. An officer in this situation need not choose between continuing his investigation and ensuring his own safety. "To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*." *See United States v. Tilmon*, 19 F.3d 1221, 1226 (7th Cir. 1994) (*quoting United States v. Maslanka,* 501 F.2d 208, 213 n.10 (5th Cir. 1974)).

AFFIRMED.

---

[1] (...continued)
directions. When Harris began his walk across the yard, Delinski was still driving south past the northbound Harris. It was only after Harris arrived on the porch that Delinski made a U-turn in Harris's direction. In short, it was not as if Delinski was slowly stalking Harris in his car in the hopes that he would eventually flee. Second, even if Delinski somehow "provoked" Harris's beeline across the yard, it did nothing to change the fact that flight upon seeing the police is suggestive of wrongdoing and thus pertinent to reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).