In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3768

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

REGINA ELIZABETH RADFORD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:15-cr-40066 — **Sara Darrow**, *Judge.*

ARGUED APRIL 25, 2017 — DECIDED MAY 22, 2017

Before POSNER, KANNE, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendant, Regina Radford, was convicted of possession of heroin with intent to distribute at least 100 grams of the drug, in violation of 21 U.S.C. § 841(a)(1)—a crime that normally (though not in this case, as we'll see) subjects the offender to a minimum prison term of five years. *Id.* § 841(b)(1)(B). She argues that the search of her handbags was the product of an unlawful seizure of her—a seizure not authorized by warrant or probable

cause—and that she did not consent to the search. The district judge, however, agreed with the government that Radford had not been seized and had consented to the search, and if this is right then she was rightly convicted of violating section 841(a)(1). But if the police found the heroin not because (as they argue and the judge found) Radford permitted them to search her handbags, but because by seizing her they left her with no choice but to consent to their searching her bags, she is entitled to be acquitted, for in the circumstances that she posits, the search of the bags was the product of warrantless and therefore unauthorized coercion.

The story begins in September 2015, when Radford boarded an Amtrak train in Flagstaff, Arizona, planning (we now know) to deliver heroin to a person in Toledo, Ohio. The train made a stop in Galesburg, Illinois, and while it was stopped there a Galesburg police officer named Mings, having studied Radford's travel schedule (he testified that he goes every day to the Amtrak station to study the travel plans of passengers who booked roomettes on trains stopping at the station), noted several potential indicators that she was engaged in drug trafficking: she had purchased a one-way ticket two days before the trip, had paid a premium for a roomette, and was traveling between locations that Mings understood to be sources of illegal drugs: Flagstaff and Chicago being source cities and Ohio a source state. He checked government records for possible criminal history and learned that Radford had been arrested more than seven years earlier for assisting undocumented aliens and for possessing marijuana, but he didn't know whether the arrest had led to prosecution, conviction, and punishment. And so he decided to accost her during the train's brief stop in Galesburg.

The defendant was sitting in a roomette measuring 3 ½ feet by 6 ½ feet (for a video of an Amtrak roomette see Amtrak, "Video Tour of Amtrak Roomette," http://blog.amtrak.com/2014/02/video-tour-amtrak-roomette/ (visited May 16, 2017)). Mings, in full police uniform, knocked on the door. The defendant, without having to stand, opened it. Mings remained standing in the hallway. He identified himself as an officer of the Galesburg Police Department and the Drug Enforcement Administration, and told her that they (there was another officer with him, although that officer didn't speak to Radford) were doing "security checks" to "check for people transporting illegal narcotics on trains." He requested her to show him her identification and train ticket. She had only an electronic train ticket, which was on her phone, but she handed him her identification, which he examined and returned. He asked whether her luggage was in the roomette and then told her he was going to ask her a series of "security questions." He asked: "Did you pack your own bags? Did anyone ask you to transport anything for them? Are you transporting any illegal narcotics? Are you transporting any large sums of currency? And do you have any weapons?" She said that she had packed her own bags but answered no to the other questions. Last and critically he asked her whether he and the other officer could search her luggage "to confirm all statements were true." Radford responded, "I guess so. You're just doing your job." He then asked her to step out of the roomette so that he could search her luggage, and she complied.

Throughout the interview Mings spoke in what the district court determined was a "conversational tone." But he never advised Radford that she could refuse to speak with

him or to deny his request to search her bags. The search, to which she consented, revealed 707 grams of heroin contained in capsules in her makeup bag and her purse.

She was indicted and moved to suppress the evidence of the heroin on the ground that it was the fruit of an unlawful seizure. After a hearing the district judge denied her motion on the ground that her encounter with Mings had been consensual rather than a seizure and that she had voluntarily consented to the search. She then pleaded guilty, reserving however a right to appeal the denial of her motion to suppress. The judge found Radford eligible for safety-valve relief from the five-year statutory minimum sentence, see 21 U.S.C. § 841(b)(1)(B); 18 U.S.C. § 3353(f), and sentenced her to 12 months' imprisonment.

"Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means," *United States v. Drayton*, 536 U.S. 194, 201 (2002), and a seizure hasn't taken place so long as "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," *Florida v. Bostick*, 501 U.S. 429, 436 (1991); see also *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v. Notorianni*, 729 F.2d 520, 522–23 (7th Cir. 1984); *United States v. Savage*, 889 F.2d 1113, 1116–17 (D.C. Cir. 1989).

Radford, however, argues that she was intimidated by Mings, primarily because the roomette was small, Mings weighed 170 pounds and was fully uniformed and equipped (he was wearing a holster with a gun in it), he was white and she was black, he was standing and she was sitting, he said

he was investigating drug trafficking but didn't tell her she had a right to refuse to answer his questions or consent to a search of her handbags.

Her argument exaggerates the situation. Mings didn't enter the roomette before she consented to the search, his uniform with its accouterments established his identity as a police officer, he told her why he wanted to search her, there can't be a rule that a police officer is forbidden to speak to a person of another race, and since he didn't tell her that she had to answer his questions and didn't threaten her with arrest there was no need to tell her that she didn't have to answer his questions or consent to a search—that was implicit in his asking her questions without telling her that she was required to answer them.

Radford's argument that her Fourth Amendment rights were violated is weaker than that of the two defendants in *United States v. Drayton*, *supra*, 536 U.S. at 197–98. There the police officer's face was only 12 to 18 inches from the face of one of the defendants when the officer questioned him on a bus, two other officers being stationed at the front and back of the bus and thus visible to the defendants. The officer displayed his badge before asking to search their bags and persons and telling them they were investigating drugs and weapons on the bus. *Id.* at 198–99. The Supreme Court held that the defendants had not been seized; it rejected their argument that their being in a bus, confronted by police displaying badges and with other officers standing at the bus doors, would make a reasonable person feel coerced. *Id.* at 203–05. For similar cases see *Florida v. Bostick*, *supra*, 501 U.S. at 433, 436–37; *Schneckloth v. Bustamonte*, *supra*, 412 U.S. at 227; and the *Notorianni* and *Savage* cases, also cited earlier.

A case especially close to the present one is *United States v. Goodwin*, 449 F.3d 766 (7th Cir. 2006), where three police officers had stood outside the defendant's roomette on a train about to leave and asked him whether he was "willing to answer some questions." *Id.* at 767. When he said yes, they requested his tickets and identification, asked whether he was "carrying weapons, narcotics, or large amounts of money" and asked for permission to search his bags. *Id.* We held that the encounter up to that point had "undoubtedly" not constituted a seizure. *Id.* at 768.

It would have been better had Mings, like his counterpart in *Goodwin*, 449 F.3d at 767, asked whether Radford was "willing to answer some questions," or like his counterpart in *Notorianni*, 729 F.2d at 521, whether he "could ask [her] some questions"; see also *United States v. Leiva*, 821 F.3d 808, 813–14, 817–18 (7th Cir. 2016). But there was nothing stopping *her* from asking Mings whether she was under arrest and had to answer his questions. In all likelihood she answered his questions because she knew the jig was up. Cf. *United States v. Savage*, *supra*, 889 F.2d at 1115. She knew that she was carrying a substantial quantity of an illegal drug and that she had an arrest record for trafficking illegal immigrants and possessing marijuana. She probably guessed the police knew all this, and if so she probably also surmised that they knew the purpose of her train trip. She may well have realized that if she clammed up she would be greeted by police at the other stops on her trip, and at her final destination, by which time the police might have obtained a warrant to arrest and search her. Or she may have thought that answering questions and consenting to a search would allay suspicion, inducing the police to leave after a minimal search or even without searching at all.

Radford further argues that even if she wasn't seized, her response to Mings's request to search her bags was not a voluntary consent to search. She may not have known that she *could* refuse. But the Supreme Court in *Schneckloth v. Bustamonte*, *supra*, 412 U.S. at 227, 248–49, held that the lack of such knowledge is not dispositive. Radford contends that her response—"I guess so. You're just doing your job."—is so noncommittal as not to amount to a "yes." It's true that some phrases offered in response to a request to search, like "whatever," "resistance is futile," or the line uttered in *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999), "you've got the badge, I guess you can," could indicate acquiescence rather than consent. But "I guess so" does literally mean "yes," even if half-heartedly, and nothing otherwise indicated that her response was not voluntary.

AFFIRMED.