In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3864

UNITED STATE OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANDRE WILLIAMS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 12-CR-00054 — **William M. Conley**, *Judge.*

ARGUED APRIL 23, 2013 — DECIDED SEPTEMBER 24, 2013

Before RIPPLE and HAMILTON, *Circuit Judges,* and
STADTMUELLER, *District Judge.*[*]

STADTMUELLER, *District Judge.* On the night of March 21,
2012, City of Fitchburg police officers responded to an anony-
mous 911 call reporting a group of twenty-five individuals

---

[*]  The Honorable J.P. Stadtmueller of the Eastern District of Wisconsin,
sitting by designation.

acting loudly and displaying hand guns in a parking lot. Upon arriving at the scene, the officers observed something different: a smaller group of individuals, none of whom appeared to be acting inappropriately. The officers approached this group, which had begun to disperse slowly. For no apparent reason, one of the officers singled out the appellant, Andre Williams, and performed a frisk. Mr. Williams began to resist the frisk and tried to escape, but was ultimately restrained. Thereafter, the officers searched his body and found both a handgun and several 'ecstasy' pills. Mr. Williams was arrested and charged with being a felon in possession of a firearm. He moved to suppress the evidence seized from him, but the district judge ultimately denied his motion. Thereafter, Mr. Williams pled guilty to possession of a firearm as a convicted felon, but reserved his right to appeal. At sentencing, the district judge applied two sentencing enhancements, which significantly increased William's offense level and applicable range of imprisonment under the advisory sentencing guidelines. Following sentencing, Mr. Williams appealed his conviction and sentence to this court, arguing that the evidence used to obtain the conviction should have been suppressed, and, in the alternative, that the district judge erred in applying the sentencing enhancements. We find that the search was unlawful, and accordingly reverse the denial of his suppression motion, vacate his judgment of conviction, and remand the matter for additional proceedings consistent with this opinion. Because we reverse the underlying judgment of conviction, we need not reach the sentencing enhancement issue.

## I. Background

On the night of March 21, 2012, at 11:25 p.m., a woman called 911 to report the presence of a large group of individuals in a parking lot outside of a bar in Fitchburg, Wisconsin. The woman refused to provide her name, but explained that there were approximately twenty-five people, three or four of whom she had observed with "guns out." She did not report any fighting or threatening behavior, instead only informing the 911 dispatcher that the people were being loud while loitering in the parking lot of Schneid's, a local bar (to which the police apparently respond quite often due to reports of violence, gang activity, drugs, and weapons).

As a result of receiving this tip, the dispatcher sounded a tone at the City of Fitchburg Police Department's ("the Department") headquarters indicating a weapons call. That tone issued during the Department's nightly briefing, and a number of officers immediately suited up to respond to the call.

The officers drove to Schneid's parking lot, arriving three to five minutes after the call, and observed a much different scene than that reported by the anonymous caller. Instead of seeing a group of twenty-five belligerent men, the officers discovered only eight to ten individuals standing around a group of cars in the parking lot. At the time the officers approached the group, the individuals were not loud or otherwise acting disruptively, nor were they displaying their firearms. In fact, one of the officers, Ryan Jesberger, testified that he and the other officers from his department were not

even sure that this smaller group was the same one that had been reported by the anonymous caller.

The officers approached the group anyway. As they approached, the group apparently began to disperse, but no one attempted to flee the scene. Each member of the group appeared to act in the same manner, avoiding eye contact with the officers and walking slowly away from the area.

For reasons that are entirely unclear from the record, the officers began to perform pat-downs on the members of the group. Officer Jesberger singled out Mr. Williams, in particular, and requested that Mr. Williams step forward and display his hands. At the evidentiary hearing on this issue, Officer Jesberger stated that he started to "zero in" on Mr. Williams "once [Officer Jesberger] saw the way [Mr. Williams] was acting." However, Officer Jesberger did not provide any further detail on what, precisely, piqued his interest in Mr. Williams, as opposed to the other members of the group. While, apparently, Mr. Williams was not making eye contact with the officers and was attempting to slowly move away from the scene, all of the evidence indicates that every other member of the group was doing exactly the same thing.

After Officer Jesberger requested that Mr. Williams step forward, Mr. Williams asked "Why?," but was compliant in every other respect. At Officer Jesberger's request, Mr. Williams stepped out from his position between two cars, showed his hands, and then placed his hands on his head.

Officer Jesberger then began to pat down Mr. Williams. At that point, Mr. Williams began to move his hands toward his waist. Officer Jesberger warned Mr. Williams not to do so, but

Mr. Williams continued to move his hands. Accordingly, Officer Jesberger attempted to handcuff Mr. Williams, who instead pulled away and tried to run from the scene. He did not get very far before other officers took him down to the ground. The officers held Mr. Williams to the ground and directed that he pull his hands out from underneath him, but Mr. Williams did not (or perhaps could not) comply. They then attempted to get him to comply by striking him with their knee and taser-ing him. This worked, and Officer Jesberger was finally able to handcuff Mr. Williams. However, during this scuffle, another officer injured his knee when he moved it in an unnatural way.

With Mr. Williams successfully detained, the officers performed a pat-down search of his person and recovered a handgun, several ecstasy pills, and approximately $600.00 in cash. They immediately placed Mr. Williams under arrest.

On April 18, 2012, Mr. Williams was indicted in the Western District of Wisconsin, and charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

He then moved to suppress the gun recovered from him during Officer Jesberger's frisk. Mr. Williams argued that suppression was appropriate, because the officers did not have a reasonable suspicion on which to base either their initial investigatory stop or to perform the frisk of Mr. Williams. Magistrate Judge Stephen Crocker held an evidentiary hearing on the motion approximately one week later, after which time he recommended that Mr. Williams' motion be denied. The magistrate judge suggested that the frisk was unconstitutional but was sufficiently deliberate to require exclusion of the gun,

by proposing an extension of the logic of *Herring v. United States*, 555 U.S. 135 (2009), to a warrantless frisk in a *Terry* stop.

Both Mr. Williams and the government objected to that ruling. Mr. Williams objected to the final determination that the gun should not be suppressed; the government objected to the magistrate's finding that the frisk was unconstitutional.

While the objections were pending before District Judge William Conley, Mr. Williams entered into a plea agreement with the government. He agreed to plead guilty, but reserved his right to appeal if the district judge determined that the gun should not be suppressed.

The district judge eventually determined that the gun should not be suppressed, and Mr. Williams pled guilty. The matter progressed toward sentencing. The probation officer prepared a presentence report, determining Mr. William' guideline range of imprisonment to be thirty-seven to forty-six months. The sentencing judge applied two sentencing enhancements, and ultimately imposed a 70-month sentence.

Mr. Williams appealed, arguing that the district judge erred in failing to exclude the firearm and in applying both of the sentencing enhancements. Because we agree that the failure to exclude the firearm was in error, we need not reach the sentencing issues.

## II. Discussion

If we determine that the district judge should have suppressed the firearm, then we must vacate Mr. Williams' judgment of conviction. In such a case, we need not review the sentencing enhancement issue.

There are two grounds upon which we can find that the gun should have been suppressed. First, if we determine that the initial stop of Williams, when Officer Jesberger asked him to step out from the group and submit to a frisk, was unconstitutional, then we must also determine that all of the later occurrences, including the frisk and recovery of the firearm, were similarly unconstitutional, and likely warrant suppression. Second, even if we were to determine that the initial stop was permissible, then we must ask whether the frisk itself was constitutional. If we find that it was not, then the later recovery of the firearm was also unconstitutional, likely warranting suppression of the firearm.

For the reasons that follow, we find that the frisk was unconstitutional, and therefore hold that the district judge erred in denying Mr. Williams' motion to suppress. Accordingly, we do not reach the sentencing enhancement issue.

**A. Standard of Review**

We review the district judge's denial of Mr. Williams' suppression motion, reviewing factual findings for clear error and both legal conclusions and mixed questions of law and fact *de novo*. *United States v. Freeman*, 691 F.3d 893, 899 (7th Cir. 2012) (citing *United States v. Huebner*, 356 F.3d 807, 812–13 (7th Cir. 2004)); *United States v. Burnside*, 588 F.3d 511, 516–17 (7th Cir. 2009) (citing *United States v. Mosby*, 541 F.3d 764, 767 (7th Cir. 2008); *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008); *United States v. McIntire*, 516 F.3d 576, 578–79 (7th Cir. 2008); *United States v. Fiasche*, 520 F.3d 694, 697 (7th Cir. 2008)).

In this case, we are called upon to examine the district court's legal determination that Officer Jesberger's stop and

frisk of Mr. Williams was constitutional. The parties do not disagree over the factual record, as set forth by the district judge. Rather, their dispute is solely over the application of the relevant law to those facts. Accordingly, our review of the district judge's determination on the stop and frisk must be *de novo*—particularly because "'what happened' is not an issue," in this case. *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010) (citing *Burnside*, 588 F.3d at 516).

### B. Discussion

As we have already mentioned, there are two junctures at which we could find the search leading to the recovery of the firearm to be unconstitutional: at the moment that Mr. Williams was singled out and stopped, or at the moment that Mr. Williams was frisked. Slightly different legal standards apply to each of those situations, so we address them separately. *See, e.g., Ybarra v. Illinois*, 444 U.S. 85, 94 (1975) (pointing out that, even if an initial stop is lawful, a subsequent frisk must be separately supported to be constitutional); *United States v. McKoy*, 428 F.3d 38, 39 (7th Cir. 2005) ("It is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat-frisks has been met.").

### 1. Initial Stop

In this portion of my opinion, I disagree with Judge Hamilton, and find that the police officers' initial stop of the group of individuals was lawful.

Police officers may detain a suspect for a brief investigatory stop if they have a "reasonable suspicion based on articulable facts that a crime is about to be or has been committed."

*Carlisle*, 614 F.3d at 754–55 (citing *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir. 2003)); *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This requires "more than a hunch but less than probable cause." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)). To find that reasonable suspicion existed to justify as stop, the Court must examine the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop if it finds that "the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

The first question I must ask is what, precisely, Officer Jesberger relied upon in deciding to stop Mr. Williams. The Government points, almost exclusively, to the anonymous 911 call, itself, arguing that the call was an emergency report, which can support an officer's reasonable suspicion with less objective evidence to corroborate the report. *See United States v. Hicks*, 531 F.3d 555, 559–60 (citing *Alabama v. White*, 496 U.S. 325, 332 (1990); *New York v. Quarles*, 467 U.S. 649 (1984)). However, in passing, the government also mentions that this stop occurred at night in a high-crime area.

Do those facts, taken in conjunction with one another, support a finding that Officer Jesberger had a reasonable suspicion to stop Mr. Williams? Yes, but this is a very close call.

The 911 call, in and of itself (and despite being anonymous), provided Officer Jesberger with a reasonable suspicion to stop Mr. Williams. When responding to an emergency report, officers may use the report, itself, to justify a *Terry* stop, provided that the report describes an ongoing emergency, as opposed to general criminality. *See Hicks*, 531 F.3d at 558–59 (distinguishing *Florida v. J.L.*, 529 U.S. 266, 268 (2000) on the basis that the report in *Hicks* provided details of an ongoing emergency situation, whereas the tip in *J.L.* reported only general criminality). In *Hicks*, we found that an individual's 911 call reporting that "There's a guy beating a woman up in my house," was an emergency report justifying a *Terry* stop. *Hicks*, 531 F.3d at 557, 560. Here, the 911 call was arguably even more specific in reporting an emergency situation. The caller stated that there was a large group of people being loud and waving guns (R. 41, at 3–4) in a location at which violent crime and drug activity is regularly reported.[1] An officer responding to that scene would certainly be justified in believing that a volatile emergency situation was underway, and stopping members of a nearby group of individuals upon arrival at the scene. Therefore, I find that the 911 call supported a reasonable

---

[1] Indeed, this situation is much more egregious than that presented in *J.L.* In that case, the Supreme Court examined a tip reporting the mere possession of a firearm. *J.L.*, 529 U.S. at 273–74. Here, on the other hand, the caller reported far more: that guns were being openly displayed in a bar parking lot, to which police frequently reported in response to crime and gang activity, by a large group of people who were acting very loud. Whereas the *J.L.* caller reported a situation in which an individual was merely possessing a gun in public, the caller in this case reported the much more dangerous situation of multiple individuals displaying guns in a situation that may have been construed as a fight.

suspicion that a crime was in progress or about to be committed, making the stop a permissible *Terry* stop. *See, e.g., id.; Terry*, 392 U.S. at 30.

Moreover, that conclusion is not changed by the fact that the 911 call was made anonymously. Mr. Williams argues that the 911 call could not support a reasonable suspicion, under *J.L.*, because it was made anonymously. That is incorrect. The mere fact that the caller was anonymous is not enough, under *J.L.* to make the 911 call *per se* unreliable. *Hicks*, 531 U.S. at 558–59 (citing *United States v. Brown*, 496 F.3d 1070, 1077 (10th Cir. 2007); *United States v. Elston*, 479 F.3d 314, 319 (4th Cir. 2007); *United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006); *United States v. Terry–Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004); *Anthony v. City of New York*, 339 F.3d 129, 136–37 (2d Cir. 2003); *United States v. Holloway*, 290 F.3d 1331, 1338–39 (11th Cir. 2002); *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000)); *see also United States v. Wooden*, 551 F.3d 647 ("Doubtless greater confidence can be achieved when police know a caller's identity . . . yet, as a practical matter a name given by a caller does not make a tip any less anonymous … it would undermine the goal of the 911 system to require a caller to *prove* his identity."). So long as the call reported an ongoing emergency, *J.L.* may be distinguished. *Hicks*, 531 U.S. at 558–59 ("Every circuit to consider the question has distinguished *J.L.* when the tip is not one of general criminality, but of an ongoing emergency … or very recent criminal activity.") Here, where the caller also provided information regarding how she obtained the information on which she based her report, I find it appropriate to hold that Officer Jesberger had a reasonable suspicion for the stop. *Wooden*, 551 F.3d at 649 ("The caller in

this case told us how he knew that Wooden had a gun …
[c]orroboration of other information would not make this claim
more plausible.").

Mr. Williams also asserts that the changed circumstances
between the time of the 911 report and the officers' arrival on
the scene undermined the credibility and emergency nature of
that report, thus depriving it of its ability to provide Officer
Jesberger with a reasonable suspicion to conduct the *Terry*
stop; again, he is incorrect, though this is a much closer
question. As Mr. Williams points out, the 911 caller reported
that there was a group of 25 or more individuals in the parking
lot being very loud. When the officers arrived, only eight to ten
individuals remained, and apparently none of them were
acting in a loud or threatening manner. But I find that those
facts are not enough to strip the 911 report of either its credibil-
ity or of its emergency nature.

This does not undermine the report's credibility. As to that
issue, I look again to *Hicks*, which noted that "a lower level of
corroboration is required before conducting a stop on the basis
of an emergency report." 531 F.3d at 559 (citing *Quarles*, 467
U.S. 649). Thus, here, where the caller remained anonymous,
but provided very specific details about the location and
activities of a group of men, I believe that low level of corrobo-
ration is satisfied. Additionally, while the group was smaller,
by approximately one-half to two-thirds, upon the arrival of
police, that fact should not undermine the credibility of the
call. The officers arrived within three to five minutes, which is
more than enough time for some participants to have left
(especially if they were frightened by an escalating violent
situation) but not likely enough time for an entire group of 25

people to have left and been replaced by a new group of eight to ten. Accordingly, I find that the low threshold of corroboration required to rely on an emergency call was satisfied.

Relatedly, the fact that the officers found a much smaller group of men who were not acting loudly or brandishing weapons, did not suddenly strip the report of its emergency nature. *Wooden*, 551 F.3d 647, is instructive. In that case, an anonymous caller provided a description of an individual, who he said had drawn a weapon from his holster during a fight with his girlfriend. *Id.* Police responded and found a couple near the reported scene, who were no longer arguing. *Id.* Despite that change in circumstances, we nonetheless upheld a stop of the armed individual. *Id.*, at 649–50. The same should be the case here. Any change in the number of people present and their activity could very well have been attributable to the arrival of the police and the time between the call and the officers' arrival. That change from volatile to stable, which happened very quickly, was not guaranteed to be permanent. Indeed, in a previously-volatile situation in which guns have recently been reported, officers can (and likely should) proceed with a reasonable suspicion that violence may break out again in a short time. Moreover, the situation had not changed so drastically that the officers should have assumed that the emergency potential had entirely passed without possibility of return. Eight to ten individuals still remained in a parking lot known for the occurrence of previous violent and criminal activity. This fact supported a belief that the threat of the reported emergency continued, even after officers arrived at the scene and discovered a different situation than was initially reported.

For these reasons I find that Officer Jesberger's stop of Mr. Williams was supported by a reasonable suspicion. Accordingly, the district court properly found that the stop was permissible.

### 2. Subsequent Frisk

Both Judge Hamilton and I agree, on the other hand, that the district court's decision on the frisk issue was in error.

A reviewing court must analyze a frisk separately from an initial stop, applying a slightly different standard to determine whether the frisk was lawful. *See, e.g.*, *Ybarra*, 444 U.S. at 94; *McKoy*, 428 F.3d at 39. This separate standard is necessary to protect the public from frisks, which are "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." *Terry*, 392 U.S. at 17. Thus, given the more burdensome intrusion of a frisk, such action should only be allowed when the officer can point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger. *Id.*, at 27. In other words, an officer performing a *Terry* stop may not automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is "armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 323 (2009); *United States v. Pedroza*, 269 F.3d 821, 827 (2001) (citing *Terry*, 392 U.S. at 27). This more specific analysis, requiring the officer to hold a reasonable suspicion that the subject is "armed and dangerous" as opposed to being generally suspicious, allows courts to distinguish between legitimate and illegitimate frisks, the latter

of which constitute severe intrusions upon individual liberty. *Terry*, 392 U.S. at 27.

Again, we begin our analysis by examining the circumstances that Officer Jesberger may have relied upon in deciding to frisk Mr. Williams. The government asserts that the following facts supported Officer Jesberger's decision to frisk Mr. Williams: the fact that the group, in general, avoided eye contact with the officers and started to move away from the area upon the officers' arrival; the fact that Mr. Williams, in particular, had his hands in his pocket or near his waistband, avoided eye contact, and began to move away from the area; the fact that this all occurred in a high crime area; and the fact that the police were responding to a 911 call reporting weapons.

None of those facts, alone or together, could have supported a reasonable suspicion that Mr. Williams was armed and dangerous. To begin, the Court cannot see how the group's general behavior could possibly support a reasonable suspicion that Mr. Williams, himself, was armed and dangerous. Moreover, neither the group behavior nor Mr. Williams' own personal behavior could support a reasonable suspicion that he was armed and dangerous. Most people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area, thus making such behaviors of very little import to a reasonable suspicion determination. *See, e.g.*, *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (noting that importance of eye contact is purely subjective and easily skewed by police officers to support their view of a situation); *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010);

*United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008); *McKoy*, 428 F.3d at 40; *United States v. Portillo–Aguirre*, 311 F.3d 647, 656 n. 49 (5th Cir. 2002); *United States v. Jones*, 269 F.3d 919, 928 (8th Cir. 2001); and *United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004).

Additionally, while we understand that the fact that a stop occurs in a high-crime area may be a factor under *Terry*, we believe that the rest of the case for a frisk, here, was so weak that this factor cannot save the frisk. "Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 342 n.2 (1990) (applying *Terry*'s principles to protective sweep of a house). In fact, even when police have a warrant to search the premises of an area, they must have separate, particularized cause to search the people who are coincidentally therein. *Ybarra v. Illinois*, 444 U.S. at 91. Just as "[e]ach patron who walked into the" searched premises in *Ybarra* was "clothed with constitutional protection against an unreasonable search an seizure," so was Mr. Williams when he stood in the parking lot on the night in question. *Id.* Thus, here, where the officers knew of the high crime nature of the area, but had no other basis for reasonable, individualized suspicion of Mr. Williams, the frisk was still inappropriate.

Finally, while officers were responding to a weapons call, that fact could not give rise to a reasonable belief that Mr. Williams, personally, was armed and dangerous. By the time the officers arrived, the situation looked much different than had been reported during the 911 call. Considerably fewer people were present, and the individuals who were present

were not acting loudly or displaying their weapons. Thus, upon their arrival, the officers had practically no reason to believe that any of the remaining individuals were armed and dangerous. Indeed, the individuals with guns may have been among the 15 to 20 individuals who had left the group between the time of the call and the officers' arrival. Moreover, the 911 caller did not provide any information that would have identified Mr. Williams as one of the individuals in possession of a weapon. In sum, the 911 call was vague, circumstances had changed, and therefore we cannot envision that the call support a reasonable belief Mr. Williams was armed and dangerous.

Even taking every one of those facts in conjunction with one another, we must conclude that, together, they do not support a reasonable belief that Mr. Williams was armed and dangerous. The government is required to show that Officer Jesberger's frisk was supported by articulable facts that could establish specifically that Mr. Williams was armed and dangerous. The facts, here, are much more general, and could be applied to practically any person that had been around the area when the officers showed up that night. Indeed, similar facts could support a search of practically anyone who happens to be near a high-crime area at night when police are called. That is the very evil that the *Terry* court was concerned with unleashing, and the reason that the *Terry* court restrained the ability to frisk. *See Terry*, 392 U.S. at 17–18. Accordingly, we

are obliged to conclude that Officer Jesberger's frisk of Mr. Williams was unconstitutional.[2]

The Government argues that our recent decision in *United States v. Patton*, 705 F.3d 734 (7th Cir. 2013), compels an opposite conclusion, but we disagree. *Patton* is distinguishable. In that case, officers responded to a report of seven to eight men drinking alcohol on a public sidewalk. *Id.*, at 735. The report came at 1:30 a.m. from a high-crime neighborhood, where there had been recent shootings. *Id.* When they arrived on the scene, the officers saw several men with open beer cans, but Mr. Patton, himself, did not have a beer can. *Id.* The officers instructed all of the men, including Mr. Patton, to step toward a nearby Cadillac. *Id.* Patton began to back away from the group, stepping backwards by approximately five and fifteen feet onto the lawn behind the sidewalk he had previously been standing on. *Id.*, at 736. At an evidentiary hearing, the arresting officer stated that when a suspect backs away in that manner, it typically means that the individual has a gun or is subject to an outstanding warrant. *Id.* The officer was eventually able to bring Mr. Patton toward the Cadillac, where he frisked Mr. Patton and discovered a firearm. *Id.* The district court held that

---

[2] Certainly, it must be noted that Mr. Williams resisted officers' attempts to frisk him. But we must disregard that fact, because that noncompliance occurred only after the frisk began. For purposes of our analysis, we must look to what Officer Jesberger knew at the moment he began to frisk Mr. Williams. The frisk is permissible only if, at that point, Officer Jesberger had some reasonable suspicion that Mr. Williams was armed and dangerous. *See, e.g., United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995); *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *Terry*, 392 U.S. at 27. He did not, and therefore his frisk of Mr. Williams was unconstitutional.

the frisk was permissible and we affirmed. But, there are a number of distinguishing factors in that case. To begin, in *Patton*, the defendant was part of a group that was openly violating the law, even if he, himself, did not have a beer in his hand. Here, on the other hand, neither Mr. Williams nor the group as a whole was acting illegally in any way—indeed, they were not even loud or belligerent when the police arrived. Additionally, Mr. Patton exhibited behavior that was much more apparent and concerning than Mr. Williams' behavior, here. Mr. Patton backed up by at least five feet *after being told to step forward*, leaving the sidewalk and moving onto the lawn behind it; here, on the other hand, Officer Jesberger reported only that Mr. Williams (as well as the rest of the group) seemed to move away and act nervously. Officer Jesberger did not identify any specific movement or act by Mr. Williams that caused him concern, but rather pointed to a general sense of nervousness and backward movement, all of which occurred before Mr. Williams was asked to step forward. In fact, Mr. Williams was generally compliant with all of the officers' commands until the frisk began, and did nothing whatsoever that would have singled himself out from the other members of the group. Therefore, we believe that *Patton* is distinguishable and does not apply in this case.

It is important to note, here, that all three members of this panel reject the Government's view that the officers were entitled to frisk every person present on the scene. It is certainly clear that they lacked the requisite individualized suspicion to do so. Nonetheless, at the evidentiary hearing it became clear that, when the officers arrived on the scene, they each stopped a separate member or members of the group. *See*

R. 30, at 19–22 ("Other officers were arriving on scene and contacting various subjects within that group and attempting to obviously deem the scene safe."). Thus, Officer Jesberger likely would have stopped and frisked Mr. Williams regardless of the placement of his hands. The fact of where he had placed his hands was simply a convenient reason for doing so, afterwards.

Nonetheless, that single fact, even taken in conjunction with all of the other facts surrounding the frisk, still does not support a reasonable suspicion. To begin, Mr. Williams immediately removed his hands from his pockets at Officer Jesberger's request. It was only after Mr. Williams had removed his hands that Officer Jesberger decided to frisk him. Furthermore, the simple fact that one's hands are in one's pockets is of a similar nature to one's avoiding eye contact. In other words, it is of little value. If one were to drive down any given street, it is likely that an uncountable number of citizens would have their hands in their pockets. This does not change in high crime neighborhoods. Certain people prefer their hands to be pocketed—and why not? It can often be more comfortable. But, under the dissent's view, if Mr. Williams had simply decided not to avail himself of that comfort, he would not have been subject to a frisk. On this, we should note that we do not believe that pocketed hands are entirely irrelevant nor do we create a categorical rule finding them so. Indeed, if one's hands are pocketed in an awkward way or if it seems that the individual is holding a larger-than-average item in his or her pocket, those facts could lead a reasonable officer to believe that a gun was contained therein, and support a frisk. But, the simple act of holding one's hands in should not be grounds for

a search, even if it occurs at night in a high-crime area. We cannot support a rule that seemingly would allow those people who typically spend time in "low crime" areas (read: more affluent areas of town) to walk around with hands pocketed at night while not being subject to search, while depriving people in higher crime areas of that same ability.

### 3. *Herring v. United States*

The final question we must ask is whether Officer Jesberger's frisk of Mr. Williams was so deliberate that the exclusionary rule should apply. *Herring v. United States*, 555 U.S. 135 (2009); *see also Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (exclusion is a "last resort, not our first impulse"); *United States v. Leon*, 468 U.S. 897, 923 (1984); *Illinois v. Gates*, 462 U.S. 213, 223 (1983). In *Herring*, the Supreme Court noted that courts should not exclude evidence unless the actions in question were "sufficiently deliberate that exclusion can meaningfully deter" similar actions in the future, and that the actions were "sufficiently culpable that such deterrence is worth the price paid by the judicial system."*Herring*, 555 U.S. at 144. The magistrate judge, below, relied upon this rule in recommending that the firearm should not have been sup-pressed, and therefore we think it appropriate to address the issue.

Officer Jesberger's action, here, was both deliberate and culpable to an extent that warrants suppression under *Herring*. As we stated above, Officer Jesberger had little articulable reason to suspect that Mr. Williams was armed and dangerous. In fact, the reasons he did articulate could have been used as pretext to search practically *any* person who was near the scene

on the night of the arrest. For no apparent reason, Officer Jesberger singled out Mr. Williams, and proceeded to search him. It is entirely unclear from the record what, precisely, about Mr. Williams set off Officer Jesberger's sense that he should be searched. But, in reaching our conclusion in this case, we hope that other officers will be deterred from engaging in the arbitrary, almost random, search of individuals who happen to be near the scene of a crime. Therefore, suppression in this case is appropriate under *Herring*.

### III. Conclusion

Last, we feel it appropriate to address several additional points raised in the dissent. First, Judge Ripple overstates the fact that Mr. Williams "approached" Officer Jesberger with his hands in his pockets. Dissenting Op. at 36. While that may, technically, be true, it should be clarified that Mr. Williams approached Officer Jesberger at the officer's request and immediately removed his hands from his pockets at the officer's request. This sort of compliant behavior is not the makings of reasonable suspicion that a person is armed and dangerous. Moreover, this is a much different picture than that painted by Judge Ripple: Mr. Williams never walked toward Officer Jesberger with his hands pocketed. In fact, Mr. Williams "tried to kind of walk away from the area." R. 11. Second, Judge Ripple asks for a more concrete rule, wondering what more a subject must "do before an officer can conduct a protective frisk?" Dissenting Op. at 42. But we do not believe any new concrete rule is necessary. Indeed, the rule remains the same: the police officer must have reasonable suspicion that the subject is armed and dangerous. That reasonable suspicion was simply not present, here.

For all of these reasons, we hold that Officer Jesberger lacked a reasonable suspicion to conduct a frisk of Mr. Williams at the time the frisk began, in violation of Mr. Williams' Fourth Amendment rights. Accordingly, we must REVERSE the denial of Mr. Williams' motion to suppress, VACATE his judgment of conviction, and REMAND this matter with instructions to the district judge to grant his suppression motion and for additional proceedings consistent with this decision. As already stated, because we determine that Mr. Williams' conviction must be vacated, we do not reach the sentencing issues raised by the parties.

HAMILTON, *Circuit Judge*, concurring in part and concurring in the judgment. I join the portions of Judge Stadtmueller's opinion holding that the frisk of defendant Williams violated his constitutional rights and that no good-faith exception is available to avoid the exclusionary rule. I also therefore join in the judgment to reverse the judgment of the district court and to remand for further proceedings.

I do not join the portion of the opinion (Part II-B-1) holding that the police officers could lawfully carry out a *Terry* stop of Mr. Williams. That portion of the opinion is not actually necessary to the judgment, and the question is a close one, especially as state law and federal constitutional law have been evolving to provide expanded protection for individual possession of firearms in public. See *Rabin v. Flynn*, — F.3d —, —, 2013 WL 3455689, at *8–*10 (7th Cir. July 9, 2013) (Rovner, J., concurring); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (striking down Illinois law prohibiting most people from carrying firearms in public), reh'g en banc denied, 708 F.3d 901 (7th Cir. 2013); *State v. Hamdan*, 665 N.W.2d 785, 811–12 (Wis. 2003) (reversing conviction for carrying concealed weapon; store owner carried concealed weapon in his store for his security in high crime neighborhood). In essence, as public possession and display of firearms become lawful under more circumstances, Fourth Amendment jurisprudence and police practices must adapt. [1]

---

[1] To describe federal constitutional law as "evolving" is to use a loaded term these days. There can be little doubt, though, that *District of Columbia v. Heller*, 554 U.S. 570 (2008), overturned the established federal constitutional understanding that the Second Amendment did not provide an

(continued...)

A *Terry* stop requires reasonable suspicion that the individual subject has committed or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 22–23 (1968); see also *United States v. Place*, 462 U.S. 696, 702 (1983). To focus on the facts of this case, the 911 caller here reported that three or four people in a group of approximately twenty-five had "guns out" outside a troublesome bar. When asked by the 911 operator, she said they were not fighting, taunting, or threatening each other. She also said she did not see anyone pointing guns at anyone else.

When the 911 call came in shortly after 11:00 p.m., the entire night shift of the Fitchburg Police Department, six or seven officers, was at headquarters for the nightly briefing. All the officers responded immediately. Within five minutes, they arrived outside the bar with their own "guns out." The officers found eight to ten people remaining outside the bar. But by the time of the officers' arrival, no guns were visible, nor was anyone in the remaining group acting in a suspicious way that officers could later identify at the suppression hearing, except that the people did not make eye contact with officers and they began to walk slowly away from each other. Cf. *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (subject's unprovoked flight from police arriving in high-crime area supported *Terry*

---

[1] (...continued)

individual right to bear arms independent of a State militia, or that *McDonald v. City of Chicago*, — U.S. —, 130 S. Ct. 3020 (2010), reinterpreted an amendment intended to *protect* the powers of States and made it applicable *against* States. See, *e.g.*, *United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (Second Amendment applied only to Congress; States remained free to restrict or protect the right to bear arms under their police powers).

stop). The police officers moved in. They stopped and started to frisk everyone on the scene, including Williams.

Did the police have reasonable suspicion to justify a *Terry* stop of everyone, or of Williams in particular? I doubt it, but the question is close enough that the better course would be to bypass the question and reverse because the frisk of Williams was not justified, as Judge Stadtmueller has explained.

Let's start by asking what crime was suspected or feared here? The government does not specify, but the best candidate for an actual crime is disorderly conduct, with or without Wisconsin's enhancement for disorderly conduct with a dangerous weapon. See Wis. St. §947.01(1) (disorderly conduct); §939.63 (enhanced penalties for committing crimes while armed with dangerous weapon). The disorderly conduct statute outlaws "violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance," but with a new and important qualification discussed below.

Without the mention of the guns, there was just a gathering of people talking loudly outside a bar, so my colleagues' conclusion about the authority for a *Terry* stop here stands or falls on the significance of the 911 caller's report that three or four individuals had "guns out."[2] From the 911 call, it's clear

---

[2]   The facts here do not support the conclusion that the police were responding to an ordinary disorderly conduct call. They were responding to a 911 call about guns, and the guns were the reason the situation was treated as an emergency calling for the entire shift to respond. The

(continued...)

that the visible guns frightened the caller. They also gave the police officers good reason to be cautious, but that is not necessarily enough to justify the intrusion of a *Terry* stop. Even a *Terry* stop alone, without a frisk, still requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

The qualification about disorderly conduct is based on a new Wisconsin law. The incident here occurred on March 21, 2012. Some months earlier, Wisconsin had amended its disorderly conduct statute to protect civilians' rights to possess and even display loaded firearms in public places. Before July 2011, the disorderly conduct statute had provided:

> Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.

Wis. Stat. §947.01 (2010). In 2011, as part of a comprehensive rewrite of firearm laws in Act 35, Wisconsin added the following paragraph to the disorderly conduct statute to protect the rights to possess and carry firearms openly in public:

---

[2] (...continued)

government does not argue that the group outside the bar—either the original group of twenty-five or the remaining group of eight to ten—or any individual within the group was "unreasonably loud" or "boisterous," possibly triggering the disorderly conduct statute without considering whether or not individuals in the group were also armed.

> (2) Unless other facts and circumstances indicate a criminal or malicious intent on the part of the person apply, a person is not in violation of, and may not be charged with a violation of, this section for loading, carrying, or going armed with a firearm, without regard to whether the firearm is loaded or is concealed or openly carried.

Wis. Stat. §947.01(2) (2012).

The new Wisconsin statute makes it clear that the persons on the scene could not have been arrested for disorderly conduct for displaying guns, for there was no indication of "criminal or malicious intent." The 911 caller said first that several people had "guns out" and later that they were "waving" the guns but not threatening anyone. Visible guns may be disturbing to those nearby, but that's the point of the new Wisconsin statute. Merely possessing or displaying a gun without criminal or malicious intent does not violate the law, even if the display is disturbing or frightening to others. A *Terry* stop does not require probable cause for an arrest, of course, but it still requires reasonable suspicion of genuinely criminal conduct. Based on the new Wisconsin law, that is hard to find on this record.

In questioning the authority for a *Terry* stop here, I do not mean to suggest that the police could not or should not have responded to the 911 call. The caller reported what might have been a dangerous mixture of alcohol and guns late at night outside a bar known to the police as a trouble spot. I recognize that the blend of firearms and alcohol late at night could have

become dangerous and/or criminal within a split-second. It was appropriate to respond to the 911 call with a strong and visible police presence, one that involved talking with people on the scene when they arrived. Such police actions do not raise Fourth Amendment issues and may do a great deal to prevent trouble. See *Florida v. Rodriguez*, 469 U.S. 1, 5–6 (1984) (initial contact when officers asked civilian if he would step aside and talk with them was "the sort of consensual encounter that implicates no Fourth Amendment interest"), citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.), and *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality); 4 Wayne R. LaFave, Search and Seizure § 9.4, at 560 (5th ed. 2012). (In fact, that visible presence is the sort of police response the 911 caller asked for, not the much more aggressive response that occurred.)

Going beyond a strong and visible police presence, to *Terry* stops, however, is a significant step with important consequences. When courts say that a *Terry* stop is authorized, they are authorizing what *Terry* itself recognized is a "seizure" of the person that could involve substantial infringement on personal liberty. 392 U.S. at 16–17. When a *Terry* stop is authorized, the subject of the stop is not free to walk away. The officer is authorized to use reasonable force to require the subject to submit to the stop. *Place*, 462 U.S. at 702; *Adams v. Williams*, 407 U.S. 143, 146 (1972); 4 LaFave, Search and Seizure § 9.2(d), at 413.

What was it about this situation that could lead us to conclude that it was reasonable to stop Mr. Williams from simply walking away from the officers? There was no individualized suspicion concerning him. And the entire group, which

had dwindled from about twenty-five to eight or ten people, was peaceful and, for all the officers knew, law-abiding. There was nothing like the suspicious casing of a store window that provided reasonable suspicion in *Terry*. Nor was there any conduct like that in the principal cases relied upon by my colleagues. In *United States v. Hicks*, 531 F.3d 555, 557 (7th Cir. 2008), the emergency caller reported, "There's a guy beating a woman up in my house," and that the man had a pistol and was threatening to shoot the woman. That was a report of a crime and a real emergency. There was nothing comparable reported here. Or in *United States v. Wooden*, 551 F.3d 647, 648 (7th Cir. 2008), the 911 call said that an armed man was arguing with his girlfriend, had a gun in a holster, and had pulled out the gun. That was not as volatile as the report in *Hicks* but was still closer to criminal conduct than was reported here.

The amended Wisconsin disorderly conduct statute requires some indication of criminal or malicious intent before a person's possession of a firearm in public, whether concealed or visible, can contribute to a violation. Moreover, we have held that the Second Amendment includes at least some individual right to carry a gun in public, subject to restrictions that remain to be tested in court. *Moore*, 702 F.3d at 942. After *Heller* and *McDonald*, all of us involved in law enforcement, including judges, prosecutors, defense attorneys, and police officers, will need to reevaluate our thinking about these Fourth Amendment issues and how private possession of firearms figures into our thinking. See *Rabin*, —F.3d at —, 2013 WL 3455689, at *7 (Rovner, J., concurring) (noting that private citizens in Illinois may soon be carrying firearms in public,

resulting in more investigatory stops and a need to define and respect limits for such stops). As we work our way through those issues case by case, we also need to recognize genuine safety concerns of police officers and citizens, as well as the potential for intentional or unintentional discrimination based on neighborhood, class, race, or ethnicity.

Five or six years ago, I would have had little trouble agreeing with my colleagues that the police here faced a potential emergency and that a *Terry* stop was justified. But the combination of *Heller*, *McDonald*, and *Moore* under the federal Constitution, and Wisconsin's laws, including the 2011 amendment to its disorderly conduct statute and adoption of Article I, section 25 of its Constitution, together convince me that the calculus is now quite different. I have no doubt that these changes in the law make the work of police officers more difficult and more dangerous. I also fear that human and institutional responses to those dangers may increase the risk of profiling based on race, ethnicity, dress, class or neighborhood. The new constitutional and statutory rights for individuals to bear arms at home and in public apply to all. The courts have an obligation to protect those rights for people in bad neighborhoods as well as good ones. See *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3087–88 (2010) (Thomas, J., concurring in the judgment) (explaining historical importance of individual right to bear arms for black citizens in defending themselves from racially-motivated violence by whites).

For these reasons, I concur in only part of Judge Stadtmueller's opinion and in the judgment to reverse and remand the case.

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. I agree with Judge Stadtmueller that Officer Jesberger's stop of Mr. Williams was justified. It is clear that, in order to perform a constitutional "stop," circumstances must lead an officer "reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1972). As one commentator has noted, "reference to when 'criminal activity *may be* afoot' strongly suggests that though the arrest standard may sometimes require that guilt be more probable than not, this is never the case as to a stopping for investigation, where the very purpose is to clarify an ambiguous situation." Wayne R. LaFave et al., Criminal Procedure § 3.8(d) (5th ed. 2009), (footnote omitted). Consequently, although an officer may have discovered, upon investigation, that the reported display of weapons was without criminal or malicious intent, *see* Judge Hamilton's Op. at 4 (quoting Wis. Stat. § 947.01(2)), the fact that weapons were (1) being brandished by individuals, (2) who were part of a boisterous crowd of twenty-five, (3) outside of a bar, (4) which previously had been identified as a high-crime location, (5) late at night, and (6) in such a manner as to cause passers-by to leave the area and contact authorities, justified police investigation. No protections for gun owners set forth in the Wisconsin Statutes negate the constitutional and salutary efforts of police to look into the possibility that weapons were being used to escalate an argument or to engender intimidation, or were being waived recklessly by intoxicated individuals in a way that might endanger the public. The fact that any of the circumstances described by the caller "may have been independently susceptible to innocent explanation does not negate their collective contribution to Officer [Jesberger's] reasonable

suspicion under the totality of the circumstances." *United States v. Richmond*, 641 F.3d 260, 262 (7th Cir. 2011).

Unlike my colleagues, however, I believe that the frisk performed by Officer Jesberger also was supported by reasonable suspicion. I therefore respectfully dissent.

### A.

The Supreme Court in *Terry*, 392 U.S. at 24, recognized "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." Thus, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he is permitted to take reasonable steps to assure the safety of himself and others. *Id*. This includes conducting "a reasonable search for weapons." *Id.* at 27.

However, once an officer has lawfully stopped a suspect, he is not automatically entitled to conduct a protective pat-down or frisk. "[T]here must be a separate analysis of whether the standard for pat-frisks has been met." *United States v. McKoy*, 428 F.3d 38, 39 (1st Cir. 2005); *see also United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999). "The officer need not be absolutely certain that the individual is armed"; rather he must have a reasonable suspicion that his "safety or that of others [i]s in danger." *Terry*, 392 U.S. at 27. The Court has explained that the necessary quantum of proof to establish reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490

U.S. 1, 7 (1989). "[T]he reasonable suspicion standard is an objective one," which asks "whether a reasonable police officer, faced with the circumstances confronting [the officer in the case], would believe that [the suspect] posed a danger to those in the immediate vicinity." *United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 27). Thus, whether an officer has reasonable suspicion "turns on the totality of the circumstances confronting the officer." *Id.*

The Supreme Court has explained that the totality of the circumstances requires "tak[ing] into account" "the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The Court elaborated:

> [T]he assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. *From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.*
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by

scholars, but as understood by those versed in the
field of law enforcement.

*Id.* at 418 (emphasis added). Circumstances to be considered as
part of the reasonable suspicion analysis include: the officer's
experience and training, *United States v. Arvizu*, 534 U.S. 266,
273 (2002); the stop's location, *United States v. Tinnie*, 629 F.3d
749, 752 (7th Cir. 2011) (noting that the stop occurred in a high-
crime area); when the stop occurred, *Patton*, 705 F.3d at 738
(noting that the stop occurred in "essentially the middle of the
night"); and the suspect's demeanor and behavior, *United
States v. Ocampo*, 890 F.2d 1363, 1368 (7th Cir. 1989). Frequently
"[a]ny one of these factors [identified by the officer] is not by
itself proof of any illegal conduct and is quite consistent with
innocent [conduct]. But … taken together they amount to
reasonable suspicion." *Sokolow*, 490 U.S. at 9.

## B.

Applying these well-established principles, I would hold
the frisk of Mr. Williams to be within the bounds delineated by
*Terry* and supported by reasonable suspicion.

I begin by recalling the circumstances facing Officer
Jesberger when Mr. Williams approached him because these
circumstances must support a reasonable suspicion that
Mr. Williams specifically was armed and dangerous. *See Tinnie*,
629 F.3d at 751 ("In determining whether an officer had
reasonable suspicion, courts consider the circumstances known
to the officer at the time of the [frisk]." (internal quotation
marks omitted)). Officer Jesberger knew that Mr. Williams and
the other members of the group were in a high-crime area,

relatively late at night, that the 911 call reported the presence of several firearms and that Mr. Williams and other members of the group refused to make eye contact with the police and attempted to move away from the scene upon the officers' arrival.

As the majority notes, the Supreme Court has emphasized that reasonable suspicion is "a suspicion [about] the particular individual being stopped." *Cortez*, 449 U.S. at 418. However, officers are not required to ignore facts that, by themselves, are insufficient to create a reasonable suspicion. Indeed, these facts are part of the totality of the circumstances and must be considered when assessing reasonable suspicion. *See, e.g., Ocampo*, 890 F.2d at 1368 (holding that although insufficient by itself, "[t]he information supplied by [an] informant [i]s just one factor among many" to consider when determining whether officers had "a reasonable and articulable suspicion"). Moreover, we consistently have found reasonable suspicion sufficient to justify frisks based on generalized, background facts *in conjunction with* particular facts about the suspect. *See, e.g., Patton*, 705 F.3d at 738-39 (considering factors "beginning with the general and moving toward the specific" that justified the officers' reasonable suspicion, such as the "high-crime area of the city" where the frisk occurred, the time of night of the frisk, as well as the suspect's "evasive behavior" and "nervous demeanor"); *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (finding reasonable suspicion based on the suspect's "behavior, coupled with the other circumstances," such as the fact that the encounter with the suspect "occurred at night in a location that was known to the officers to be a high-crime area"); *Brown*, 188 F.3d at 865 (finding "reasonable suspicion

that [the suspect] might be armed and dangerous which was sufficient to support [the officer's] decision to conduct the pat-down search" when the suspect's individual behavior was considered "[a]gainst th[e] background" of the stop's location).

The generalized facts outlined above were not the only circumstances confronting Officer Jesberger when he decided to frisk Mr. Williams. Rather, Mr. Williams did something that distinguished him from the rest of the group and that caused the officer to conclude that a frisk was necessary. The magistrate judge and the district court both credited Officer Jesberger's testimony at the suppression hearing:

> [T]he thing that drew me to Mr. Williams was that his hands were in his pockets and he was kind of avoiding—everyone was avoiding eye contact with us and that's usually, based on my training and experience when people are avoiding eye contact and kind of trying to walk away from us, that's a pretty good sign that something is up.[1]

He also testified that, upon his request to Mr. Williams "to come over and speak with me," Mr. Williams initially replied "why"; Officer Jesberger then repeated his request, and Mr. Williams complied.[2] As Mr. Williams approached Officer Jesberger, however, he kept his hands in his pockets. Observing the placement of Mr. Williams's hands, Officer Jesberger requested that Mr. Williams "to place both of his

---

[1]  R.20 at 20.

[2]  *Id.* at 12.

hands—take both of his hands out of his pocket … ."[3] He also decided "to conduct a pat-down for my safety and for the safety of everyone there due to the [weapons nature of the] call and due to him having his hands in a weapon area."[4] Officer Jesberger explained that the location of Mr. Williams's hands was his "first and foremost … concern," because

> with a weapons call, if people have a gun, it's typically not going to be a place where I'm going to be able to see it. So it's either going to be in their pockets, their waistband, and that's where [Mr. Williams's] hands were, so that's why the concern was there.[5]

When asked if he was "concerned about officers' safety," Officer Jesberger responded that he was concerned "[f]irst and foremost [with the safety of] the community and everyone else around there, as well as officer safety" based on the attendant circumstances and Mr. Williams's behavior.[6]

Courts since *Terry* have made clear that in assessing whether, under the totality of the circumstances, an officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," "due weight

---

[3]    *Id.* at 12-13.

[4]    *Id.* at 13-14.

[5]    *Id.* at 13.

[6]    *Id.*

must be given … to [the officer's] specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 24, 27; *see also United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (holding that the totality of the circumstances "include[] the 'experience of the law enforcement agent'" (quoting *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995))); *United States v. Andrade*, 551 F.3d 103, 112 (1st Cir. 2008) (holding that in forming a reasonable suspicion that a suspect may be armed and dangerous, an officer "may draw on his own experience and specialized training to make inferences from and deductions about the cumulative information . . . that might well elude an untrained person" (internal quotation marks omitted)). Frequently, reasonable suspicion is found based on "the circumstances of the encounter, *in combination with* [the officer's] experience and training." *Oglesby*, 597 F.3d at 895.

Based on his training and experience, Officer Jesberger believed that Mr. Williams was secreting a weapon because Mr. Williams approached him with his hands in his pockets. We have recognized that the placement of a suspect's hands in his pockets or at his waistband is a legitimate consideration in assessing whether an officer is justified in believing that an individual is armed and presents a threat to himself or to others. *See, e.g.*, *United States v. Mitchell*, 256 F.3d 734, 736 (7th Cir. 2001) (finding reasonable suspicion where the frisking officer testified that, "'[f]rom past experience, [the fact that Mitchell's hand was on the front of his waist] either signified that, one, they're holding on to something in their waistband, be it a gun or drugs" and that "I strongly felt in this case, considering the shots fired call we had received and

Mr. Mitchell's action, that it was a—it was a gun in his case'"
(alteration in original)); *see also, e.g.*, *United States v. Mays*, 643
F.3d 537, 542 (6th Cir. 2011) (identifying that the suspect
"frantically dug his hands into his pockets" as one of the
totality of circumstances justifying a frisk); *Andrade*, 551 F.3d at
113 (finding that the facts that "Andrade had his hands in his
pocket[] and refused to make eye contact" contributed to
officer's objectively reasonable belief that he was in danger);
*United States v. Ellis*, 501 F.3d 958, 962 (8th Cir. 2007) (noting
that suspect "act[ed] nervously and reach[ed] toward his
pocket" among other factors that justified a frisk).

This particularized information about Mr. Williams's
conduct is significant because it distinguished Mr. Williams
from the other members of the group and from merely "any
person that had been around the area when the officers
showed up that night," Majority Op. 18. His specific behavior,
indicative of weapon possession, must be taken into account in
determining whether the officer had a reasonable suspicion
that Mr. Williams was armed and dangerous.

Mr. Williams's placement of his hands in an area where
weapons typically are secreted while in close proximity to a
police officer must be considered *in conjunction with* the other
circumstances confronting the officers—the report that some in
the group were armed, evasive behavior upon the officers'
arrival, the high-crime location, time of the encounter and the
presence of others nearby. Considering all of these factors, I
conclude that they create a reasonable suspicion that
Mr. Williams was armed and posed a risk to the safety of the
officers and the public. Therefore, I would hold that Officer

Jesberger was justified in conducting a protective frisk of Mr. Williams before conducting further investigation.

The majority's decision creates an unworkable rule for police and disregards *Terry*'s concern for officer safety. The majority holds that a police officer is not entitled to conduct a protective frisk of a suspect whom "he is investigating at close range," *Terry*, 392 U.S. at 24, when the officer has received a report that some in the group of which the suspect is a part possess weapons and the suspect's behavior indicates that he likely is armed. The majority offers no guidance to the police in this situation. What more must the suspect do before an officer can conduct a protective frisk? The majority does not say. How does the commanding officer of a police precinct explain today's holding to his police officers before they take to the streets in the gang-infested areas of the major cities within this circuit?

How much more risk must an officer be required to absorb before he can take minimal actions to protect himself? The Supreme Court stated in *Terry* that "to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm," is "clearly unreasonable." *Id*. This is the practical effect of the majority's holding. It constitutes a major departure from the established case law of the Supreme Court and of this court. *See* Sup. Ct. R. 10.

For the foregoing reasons, I respectfully dissent.